**FILED**

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------X

IN RE: SUBPOENA TO THE UNITED
STATES SECURITIES AND EXCHANGE
COMMISSION

Case: 1:07-mc-00280
Assigned To : Lamberth, Royce C.
Assign. Date : 6/29/2007
Description: Miscellaneous

------------------------------------------------------

AVIVA PARTNERS LLC[1], Individually and On
Behalf of All Others Similarly Situated,

                  Plaintiffs,

(D.N.J. Lead Docket
No. 3:05-cv-03098-MLC-JJH)

vs.

EXIDE TECHNOLOGIES
13000 Deerfield Parkway
Alpharetta, GA 30004,

**MOTION TO QUASH
SUBPOENA DIRECTED TO THE
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION**

CRAIG H. MUHLHAUSER
94 Library Place
Princeton, NJ 08540,

IAN J. HARVIE
2832 Ogden Street
Philadelphia PA 19130,

J. TIMOTHY GARGARO
3245 Morningview Terrace
Bloomfield Hills, MI 48301,

                  Defendants.

------------------------------------------------------X

Pursuant to Federal Rule of Civil Procedure 45(c)(3)(A)(iii) and (B)(i), Defendants Exide

Technologies ("Exide"), Craig H. Muhlhauser, Ian J. Harvie and J. Timothy Gargaro (the

---

[1]    Aviva Partners LLC remains the named party in the underlying litigation but two other groups of plaintiffs have been named as co-lead plaintiffs by the District Court for the District of New Jersey: the Alaska Hotel and Restaurant Employees Pension Trust Fund, 1215 4th Ave., # 2400, Seattle, WA 98161, and Lakeway Capital Management LLC, 840 Apollo Street, Suite 223, El Segundo, CA 90245.

"Defendants"), by and through their undersigned attorneys, respectfully request that the Court enter an order quashing the subpoena served on the United States Securities and Exchange Commission ("SEC") by Plaintiffs in the matter entitled *Aviva Partners, LLC v. Exide Technologies, et al.*, No. 3:05-cv-03098-MLC-JJH, now pending in the United States District Court of New Jersey. In support of their Motion, Defendants state as follows:

1.      This Motion arises out of ongoing litigation pending in the United States District Court for the District of New Jersey captioned *Aviva Partners LLC v. Exide Technologies, et al.*, Lead Docket No. 3:05-cv-03098-MLC-JJH.  Lead Plaintiff's Corrected Consolidated Class Action Complaint ("Complaint") in that case alleges violations of the federal securities laws in connection with certain statements made by Exide and former Exide officers between May 4, 2004 and May 17, 2005 and Exide's announcement on May 16, 2005 that it expected to violate certain loan covenants in its Senior Credit Facility. (*See* Complaint, a true and correct copy of which is filed herewith as Exhibit A to the Declaration of John Rosans in Support of Defendants' Motion to Quash Subpoena Directed to the United States Securities and Exchange Commission ("Rosans Declaration").) Defendants' motion to dismiss the claims against them was denied on March 13, 2007 and discovery in the *Aviva* case has commenced.

2.      In addition to the pending *Aviva* litigation, Defendants have been informed by the SEC that Exide is the subject of an informal SEC investigation into issues similar to those upon which Plaintiffs base their claims in *Aviva*. (*See* Exide's July 8, 2005 8-K, a true and correct copy of which is filed herewith as Exhibit B to the Rosans Declaration.) Defendants have been cooperating fully with the investigation, which Defendants believe is ongoing.

3.      On May 25, 2007, Plaintiffs issued their First Request for Production of Documents to Defendants in the *Aviva* litigation. (*See* "Document Requests", a true and correct

copy of which is filed herewith as Exhibit C to the Rosans Declaration.)  In their Document

Request Plaintiffs seek, among other things:

> All documents produced to the SEC or any other governmental agency in
> response to any investigation, or formal or informal inquiries or requests for
> information, including any third-party documents related to such investigations.

and

> All documents reflecting communications with the SEC or any other
> governmental agency relating to or concerning Exide, including, but not limited
> to, transcripts of testimony, exhibits to such testimony, interview notes, and Wells
> notices and Wells submissions

(*See* Document Requests at 11-12.)  Defendants have begun negotiating with Plaintiffs on the

scope of their Document Request but have not yet filed written responses thereto.

4.      Also on May 25, 2007, Plaintiffs issued a subpoena from this Court to the SEC.

(*See* "Subpoena", a true and correct copy of which is filed herewith as Exhibit D to the Rosans

Declaration.)  The Subpoena seeks the same documents Plaintiffs seek from Defendants in the

*Aviva* litigation, namely: "[a]ll documents related to the SEC Inquiry of Exide, commenced in or

about July 2005" and "[a]ll correspondence with Exide or the individual Defendants regarding

the SEC Inquiry."  (Subpoena at 7-8.)  "SEC Inquiry" is defined as "the agency's inquiry into

Exide as announced by the Company in its July 1, 2005 Form 8-K (filed with the SEC on July 8,

2005), including any related subsequent inquiries or enforcement actions."  The Subpoena called

for the SEC to produce the requested documents on or before June 22, 2007, but on that date the

SEC objected to the Subpoena and refused to produce the requested documents, stating that the

information Plaintiffs seek is subject to the law enforcement privilege.  (*See* June 22, 2007

"Letter from Noelle Frangipane, Senior Counsel for the United States Securities and Exchange

Commission, to Trig R. Smith", a true and correct copy of which is filed herewith as Exhibit E to

the Rosans Declaration.)

5.      Pursuant to Rule 7(m) of the Rules of the United States District Court for the District of Columbia, counsel for Defendants requested that counsel for Plaintiffs withdraw their subpoena for the reasons set forth herein and discussed the matter with Plaintiffs' counsel in several telephone calls and emails between June 8, 2007 and June 19, 2007. Despite good faith efforts by all counsel, the parties could not resolve their differences and Plaintiffs refused to withdraw the Subpoena.

6.      Defendants respectfully submit that the Subpoena should be quashed pursuant to Rule 45 because: (a) the documents sought by Plaintiffs are protected by the attorney work-product doctrine; (b) the documents sought by Plaintiffs constitute or contain trade secrets or other confidential commercial information; (c) the Subpoena is so broad that it calls for the production of documents that are irrelevant to the Complaint in the *Aviva* litigation; and (d) Plaintiffs have already requested identical documents from Defendants in the *Aviva* litigation and Defendants intend to object to the production of said documents in the Court in which that case is pending, thus unnecessarily creating the possibility of inconsistent rulings by this Court and that one.

7.      Federal Rule of Civil Procedure 45 grants this Court the power to quash Plaintiffs' Subpoena. Rule 45(c)(3)(A)(iii) provides, in relevant part, "[o]n a timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it ... requires disclosure of privileged or other protected matter and no exception or waiver applies ...." Fed. R. Civ. P. 45(c)(3)(A)(iii). Rule 45(c)(3)(B)(i) provides, "[i]f a subpoena requires disclosure of a trade secret or other confidential research, development, or commercial information ... the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena ...." Fed. R. Civ. P. 45(c)(3)(B)(i). Since the documents Plaintiffs seek from the SEC are

-4-

Defendants' documents, and since those documents implicate Defendants' privilege and proprietary interests, Defendants have standing to bring the instant Motion. *Fox Industries, Inc v. Gurovich*, No. CV 03-5166 (TCP), 2006 WL 2882580, *13 (E.D.N.Y. Oct. 6, 2006) (party whose records were subpoenaed from a non-party asserted privilege sufficient to confer standing to oppose the subpoena).

8.      First, the Subpoena should be quashed because it calls for the production of documents which are protected by the attorney opinion work-product privilege. Federal Rule of Civil Procedure 26(b)(3) provides that materials prepared in anticipation of litigation or for trial by an attorney or a party are protected from disclosure and may only be subject to discovery upon a showing of substantial need and undue hardship. Fed. R. Civ. P. 26(b)(3). Such materials which reflect "mental impressions, conclusions, opinions, or legal theories of an attorney" are opinion work product and are entitled to special protection and require a stronger showing of necessity to justify release. *See Disability Rights Council of Greater Washington v. Washington Metropolitan Transit Authority*, No. 04-498, 2007 WL 1585452, *4 (D.D.C. June 1, 2007). In the course of cooperating with the SEC investigation Defendants' counsel has prepared written responses to the SEC's inquiries and has reviewed and analyzed literally hundreds of thousands of documents in Defendants' possession and selected a small fraction thereof for production to the SEC. (*See* Affidavit of Carl E. Volz, hereinafter "Volz Affidavit", filed herewith as Exhibit F to the Rosans Declaration, at ¶ 2.) Both the written materials and the sets of documents compiled by Defense counsel were prepared in anticipation of litigation with the SEC and unquestionably reflect counsel's "mental impressions, conclusions, opinions, or legal theories" and, as such, are protected by the attorney work-product privilege. (*See id.*)

9.      In addition, the Subpoena should be quashed because the materials provided to the SEC by Defendants constitute or contain "trade secret or other confidential research, development, or commercial information" under Federal Rule of Civil Procedure 45(3)(B)(i). The District of Columbia has codified its version of Uniform Trade Secret Act (DCUTSA) and defines "trade secret" at D.C. CODE. ANN. § 36-401(4) as follows:

> information including a formula, pattern compilation, program, device, method, technique, or process that: A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by proper means by another who can obtain economic value from its disclosure or use; and B) Is the subject of reasonable efforts to maintain its secrecy.

The Federal Rules of Civil Procedure do not define "confidential commercial information," but case law defines this term to mean "information which if disclosed would cause substantial economic harm to the competitive position of the entity from whom the information was obtained." *Stewart v. Mitchell Transport*, No. 01 2546 JWL, 2002 WL 1558210, *8 (D.Kan. July 8, 2002) (internal quotations and citations omitted). The materials provided to the SEC include, among other things, proprietary information related to Exide's manufacturing and marketing processes, internal pricing and inventory and accounting practices which, if disclosed to Exide's competitors and/or the general public, would severely damage Exide's commercial prospects and competitive position in the marketplace. (*See* Volz Affidavit at ¶ 3.)

10.     Third, the Subpoena should be quashed because a number of the aforementioned documents which constitute or contain attorney opinion work product or trade secret information are utterly irrelevant to the allegations in the Complaint, (*see id.* at ¶ 4), yet their production is called for by the extraordinarily broad language of the Subpoena. It is axiomatic that Plaintiffs have no right to documents or information unrelated to the claims in their Complaint. Federal

Rule of Civil Procedure 26(b)(1) expressly defines the scope of discovery as follows: "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . ." As the Advisory Committee Notes to the 2000 amendment to Rule 26(b)(1) make clear, "[t]he Committee intends that the parties and the court focus on the actual claims and defenses involved in the action. . . . The rule change signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings." Hence it is clear that Plaintiffs are not entitled to these documents.

11.     Finally, the Subpoena should be quashed because Plaintiffs have already sought these same documents from Defendants in the underlying *Aviva* litigation. Defendants have not yet had an opportunity to challenge the scope of the Document Requests in the District Court for the District of New Jersey but they certainly intend to do so. Were this Court to enforce the Subpoena as written it would risk creating a situation where its orders are inconsistent with the orders ultimately entered by the District Court in New Jersey -- the Court by and before whom the matters at issue in the Complaint will ultimately be resolved. *See, e.g., Common Cause v. Judicial Ethics Comm.*, 473 F.Supp. 1251, 1253 (D.D.C 1979) (refusing to subject "one party to conflicting orders from two courts of comparable jurisdiction and authority").

WHEREFORE, for the foregoing reasons, Defendants Exide Technologies, Craig H. Muhlhauser, Ian J. Harvie and J. Timothy Gargaro respectfully request that the Court quash Plaintiffs' Subpoena to the United States Securities and Exchange Commission.

Respectfully submitted,


By: _John Rosans_

John Rosans (D.C. Bar No. 474180)
Katten Muchin Rosenman, LLP
1025 Thomas Jefferson Street, NW
East Lobby, Suite 700
Washington, D.C. 20007
Phone: (202) 625-3639
Fax: (202) 339-8267

and

David H. Kistenbroker
Carl E. Volz
Katten Muchin Rosenman, LLP
525 W. Monroe St.
Chicago, IL 60661
(312) 902-5200

-8-

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
--------------------------------------------------------X
                                        :
IN RE: SUBPOENA TO THE UNITED           :    Miscellaneous No.
STATES SECURITIES AND EXCHANGE          :
COMMISSION                              :
--------------------------------------------------------
AVIVA PARTNERS LLC, Individually and On :
Behalf of All Others Similarly Situated, :
                                        :
                            Plaintiffs,  :    (D.N.J. Lead Docket
                                        :    No. 3:05-cv-03098-MLC-JJH)
vs.                                      :
                                        :
EXIDE TECHNOLOGIES                       :    DECLARATION OF JOHN ROSANS
13000 Deerfield Parkway                  :    IN SUPPORT OF MOTION TO
Alpharetta, GA 30004,                    :    QUASH SUBPOENA DIRECTED TO
                                        :    THE UNITED STATES SECURITIES
CRAIG H. MUHLHAUSER                      :    AND EXCHANGE COMMISSION
94 Library Place                         :
Princeton, NJ 08540,                     :
                                        :
IAN J. HARVIE                            :
2832 Ogden Street                        :
Philadelphia PA 19130,                   :
                                        :
J. TIMOTHY GARGARO                       :
3245 Morningview Terrace                 :
Bloomfield Hills, MI 48301,              :
                                        :
                           Defendants.   :
--------------------------------------------------------X
```

I, John Rosans, declare as follows:

1.     I am an attorney duly licensed to practice before all of the courts of the District of

Columbia. I am an associate in the law firm of Katten Muchin Rosenman, LLP and I am counsel for

Defendants in the above-entitled action. I make this declaration in support of Defendants' Motion to

-1-

*07-280*

**FILED**

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Quash Subpoena Directed to the United States Securities and Exchange Commission. I have

personal knowledge of the matters stated herein and, if called upon, I could and would competently

testify thereto:

2.      Attached are true and correct copies of the following exhibits:

EXHIBIT A:   Corrected Consolidated Class Action Complaint in the matter *Aviva*
             *Partners LLC v. Exide Technologies, et al.*, Lead Docket No. 3:05-cv-
             03098-MLC-JJH;

EXHIBIT B    July 8, 2005 Form 8-K Filed by Exide Technologies;

EXHIBIT C    *Aviva* Plaintiffs' First Request for Production of Documents to
             Defendants, filed May 25, 2007 in *Aviva Partners LLC v. Exide*
             *Technologies, et al.*;

EXHIBIT D    *Aviva* Plaintiffs' Subpoena to the United States Securities and Exchange
             Commission, issued May 25, 2007;

EXHIBIT E    June 22, 2007 Letter from Noelle Frangipane, Senior Counsel for the
             United States Securities and Exchange Commission, to Trig R. Smith,
             counsel for Lead Plaintiffs in *Aviva Partners LLC v. Exide Technologies,*
             *et al.*;

EXHIBIT F    Affidavit of Carl E. Volz, Counsel for Defendants in *Aviva Partners LLC*
             *v. Exide Technologies, et al.*.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief. Executed this 29TH day of June, 2007, at Washington, D.C.

_John Rosans_
John Rosans

# Exhibit A

COHN LIFLAND PEARLMAN
 HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

LITE DePALMA GREENBERG
 & RIVAS, LLC
JOSEPH J. DePALMA
SUSAN PONTORIERO
Two Gateway Center, 12th Floor
Newark, NJ  07102-5003
Telephone:  973/623-3000
973/623-0211 (fax)

Co-Liaison Counsel

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

### *"DOCUMENT ELECTRONICALLY FILED"*

| | |
|---|---|
| AVIVA PARTNERS LLC, Individually ) <br> and On Behalf of All Others Similarly ) <br> Situated, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> EXIDE TECHNOLOGIES, et al., ) <br> ) <br> Defendants. ) <br> ) | No. 3:05-cv-03098-MLC-JJH <br> **(Consolidated)** <br> <br> <u>CLASS ACTION</u> <br> <br> *CORRECTED* CONSOLIDATED <br> CLASS ACTION COMPLAINT FOR <br> VIOLATION OF FEDERAL <br> SECURITIES LAWS <br> <br> <u>DEMAND FOR JURY TRIAL</u> |

*07-280*

# FILED

JUN 2 9 2007

## TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................... 1

JURISDICTION AND VENUE........................................................................ 6

PARTIES ............................................................................................................ 6

PLAINTIFFS' CLASS ACTION ALLEGATIONS .............................................. 11

BACKGROUND ................................................................................................ 13

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ......................... 13

THE TRUE FACTS WHICH DEFENDANTS CONCEALED AND
    WHICH CONTRADICTED THEIR PUBLIC STATEMENTS.................. 35

THE TRUE FACTS CONCERNING EXIDE'S FALSE FINANCIAL
    STATEMENTS................................................................................................. 35

THE TRUE FACTS CONCERNING DEFENDANTS' FALSE
    STATEMENTS THAT EXIDE HAD SUFFICIENT INTERNAL
    CONTROLS IN PLACE................................................................................. 44

THE TRUE FACTS CONCERNING DEFENDANTS' FALSE
    STATEMENTS THAT THEY WERE SUCCESSFULLY
    RESTRUCTURING EXIDE........................................................................... 53

THE TRUE FACTS CONCERNING A CONTRACT WITH A LARGE
    NORTH AMERICAN CUSTOMER ARE CONCEALED BY
    DEFENDANTS AND NOT DISCLOSED ..................................................... 56

THE TRUE FACTS CONCERNING DEFENDANTS' FALSE
    STATEMENTS THAT EXIDE'S EMERGENCE FROM
    BANKRUPTCY HAD POSITIONED THE COMPANY FOR
    SUCCESS ....................................................................................................... 57

THE TRUE FACTS CONCERNING DEFENDANTS' FALSE
    STATEMENTS THAT EXIDE WOULD COMPLY WITH THE
    SENIOR CREDIT FACILITY COVENANTS ............................................. 59

**Page**

THE TRUTH EMERGES ........................................................................... 59

ADDITIONAL SCIENTER ALLEGATIONS ......................................... 62

LOSS CAUSATION/ECONOMIC LOSS ............................................... 63

UNDISCLOSED ADVERSE INFORMATION ....................................... 67

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE
    MARKET DOCTRINE ........................................................................ 68

NO SAFE HARBOR .................................................................................. 69

FIRST CLAIM FOR RELIEF .................................................................... 70

SECOND CLAIM FOR RELIEF ............................................................... 74

PRAYER FOR RELIEF ............................................................................. 75

JURY DEMAND ........................................................................................ 76

Plaintiffs allege the following based upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Exide Technologies ("Exide" or the "Company"), as well as regulatory filings and reports, press releases and other public statements issued by the Company, media reports about the Company, and interviews of former Exide employees and others familiar with the Company's operations. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity to conduct discovery.

## INTRODUCTION

1.     This is a class action on behalf of purchasers of the common stock of Exide between May 5, 2004 and May 17, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Exide had just emerged from bankruptcy at the beginning of the Class Period and it was heavily dependent on debt financing to support its operations. A large part of the debt financing was a senior secured credit facility (the "Senior Credit Facility") obtained by Exide pursuant to a credit agreement with several lenders (the "Credit Agreement"). The Credit Agreement required Exide to comply with several financial covenants.

3.     Throughout the Class Period, defendants overstated Exide's inventory and net income and understated Exide's net losses while also misrepresenting that

- 1 -

Exide's reorganization in bankruptcy had positioned it for growth, profitability and the creation of long-term value for its shareholders. Defendants also represented that Exide had implemented a number of cost cutting and quality improvement initiatives that were currently benefiting and would continue to benefit the Company going forward. Defendants repeatedly represented during the Class Period that, based on Exide's financial condition, successful restructuring and improving operations, Exide would comply with the covenants of the Senior Credit Facility and Credit Agreement.

4.    None of defendants' representations were true, however. Defendants concealed the fact that Exide actually was in terrible financial condition coming out of the bankruptcy, and was continuing to deteriorate, as it was not attaining its sales goals, was not cutting costs, and was accumulating large amounts of obsolete inventory. The restructuring touted by defendants was also a disastrous failure, and it was apparent that Exide would violate its Senior Credit Facility covenants.

5.    Defendants attempted to hide this during the Class Period by falsifying Exide's financial statements, making it appear the Company was performing better than it actually was and further making it appear the Company would comply with the Senior Credit Facility covenants. Defendants were keenly aware of the fact that Exide had accumulated millions of dollars in obsolete and excess inventory that required a write down of assets and a corresponding charge against income, and that a write down would cause the Company to violate the Senior Credit Facility financial covenants. Yet during the Class Period, in violation of Generally Accepted

- 2 -

Accounting Principles ("GAAP"), defendants refused to write down the inventory to its proper valuation, thereby inflating Exide's reported net income (and understating its net losses). As alleged more fully herein, the obsolete inventory issue was a persistent problem for Exide throughout the Class Period and, notwithstanding an outside consultant's recommendations to write down the inventory, defendants refused. Numerous former Exide employees have indicated that there was a serious obsolete inventory problem during the Class Period that defendants refused to address.

6.     Defendants further represented that Exide had sufficient internal controls and procedures over its financial reporting to ensure the timely and accurate reporting of financial results. These statements however, were, like the financial statements, patently false. Exide essentially had no internal controls in place to ensure the accurate reporting of its actual or forecasted inventories, sales or financial results. As a result, defendants had no basis to represent that Exide would comply with the Senior Credit Facility covenants.

7.     Nonetheless, defendants maintained the illusion that Exide was performing satisfactorily just long enough to complete two note offerings in which Exide pocketed approximately $350 million in much-needed cash. Just two months later, after obtaining the cash, defendants announced that Exide would violate its covenants under the Senior Credit Facility and Credit Agreement, and that it would write down its inventory. Defendants also revealed that contrary to their representations, Exide did not have internal controls in place to ensure the accurate

- 3 -

reporting of financial information.  The market was shocked by this news as it revealed, for the first time, that defendants' Class Period statements were false.  On these revelations, Exide's stock price plummeted, falling over 50% in value in two trading days.  Plaintiffs and the proposed Class herein – who unwittingly purchased Exide stock inflated by defendants' false statements – suffered millions of dollars in damages when defendants' fraud was revealed and Exide's stock price tanked.

8.    Infuriated investors immediately began filing lawsuits alleging that defendants had committed securities fraud based, in part, on defendants' misrepresentations concerning the Senior Credit Facility and Credit Agreement covenants and Exide's inventories.

9.    Shortly thereafter, the SEC also initiated an investigation of Exide related to defendants' statements concerning the Senior Credit Facility covenants.  It was patently obvious that defendants had misrepresented Exide's financial condition.

10.    In addition, at least one purchaser of Exide's notes sued Exide, Muhlhauser and Gargaro, alleging that defendants had defrauded the purchaser by concealing that Exide knew it would violate the Senior Credit Facility covenants, could not forecast its inventory, and would not write down its obsolete inventory, among other things.

11.    Defendants' fraud, and the effect it had on Exide's stock price, are detailed below:

- 4 -



# Exide Technologies

## Daily Share Pricing: May 5, 2004 to December 30, 2005

Dollars Per Share

Class Period: 5/5/04 - 5/17/05





## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5].

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1367 and §21 of the Exchange Act [15 U.S.C. §78aa].

14.    Venue is proper in this District pursuant to §21 of the Exchange Act, and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

15.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

16.    Lead Plaintiff Alaska Hotel & Restaurant Employees Pension Trust Fund purchased the common stock of Exide during the Class Period and has been damaged thereby, as set forth in a certification previously filed with the Court.

17.    Lead Plaintiff Lakeway Capital Management purchased the common stock of Exide during the Class Period and has been damaged thereby, as set forth in a certification previously filed with the Court.

18.    Defendant Exide manufactures and supplies lead acid batteries, associated equipment, and services for transportation and industrial customers worldwide. During the Class Period, Exide had three primary business segments: Transportation, Motive Power and Network Power. The Company is incorporated in Delaware and maintained its principal place of business in Lawrenceville, New Jersey at all relevant times.

19.    (a)    Defendant Craig H. Muhlhauser ("Muhlhauser") was the Company's President and Chief Executive Officer ("CEO") from the beginning of the Class Period to March 3, 2005.

(b)    Defendant Ian J. Harvie ("Harvie") was the Company's Chief Financial Officer ("CFO"), Vice President, and Corporate Controller from the beginning of the Class Period to October 12, 2004. Thereafter, defendant Harvie served as the Company's Vice President and Corporate Controller until September 2005.

(c)    Defendant J. Timothy Gargaro ("Gargaro") served as the Company's CFO and Executive Vice President from October 2004 until December 2005.

(d)    Defendants Muhlhauser, Harvie and Gargaro are collectively referred to herein as the "Individual Defendants."

20.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations,

- 7 -

products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

21.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly-defined group of defendants identified above. Each of the above officers of Exide, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

- 8 -

22.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with Exide, each of the Individual Defendants had access to the adverse undisclosed information about Exide's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these

- 9 -

adverse facts rendered the positive representations made by or about Exide and its business issued or adopted by the Company materially false and misleading.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

25.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Exide common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Exide's business, operations, future prospects and the intrinsic value of Exide common stock; (ii) enabled the Company to complete an offering of $290 million worth of its 10-1/2% senior notes; (iii) enabled the Company to complete a $60 million Floating Rate Convertible Senior Subordinated Notes offering; and (iv) caused plaintiffs and other members of the Class to purchase Exide common stock at artificially inflated prices.

- 10 -

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

26.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Exide during the Class Period and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

27.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Exide common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Class. During the Class Period, there were over 23 million shares of Exide stock outstanding, and the average daily trading volume was in excess of 343,000 shares during the Class Period. Record owners and other members of the Class may be identified from records maintained by Exide or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

- 11 -

28.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

29.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

30.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Exide; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

31.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

- 12 -

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

32.    Exide describes itself as a "one of the world's largest producers and recyclers of lead-acid batteries."

33.    Exide emerged from Chapter 11 bankruptcy on May 5, 2004.    As previously alleged, since that time, Exide has been heavily dependent on debt financing to support is operations.

34.    A large part of that debt financing was the Senior Credit Facility, which was obtained by Exide pursuant to the Credit Agreement with several lenders, including Deutsche Bank Securities.

35.    The Credit Agreement required Exide to comply with several financial covenants, including: (1) maintaining a specified ratio of debt to equity (the "Leverage Ratio Covenant"); and (2) achieving minimum consolidated earnings before interest, taxes, depreciation and amortization ("EBITDA") (the "EBITDA Covenant").

36.    The Credit Agreement required Exide to provide monthly reports to Deutsche Bank Securities consisting of consolidated balance sheet and related consolidated statements of income, retained earnings and cash flows.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

37.    The Class Period begins on May 5, 2004.  On that date, Exide issued a press release announcing that its Plan of Reorganization under Chapter 11 of the

- 13 -

United States Bankruptcy laws became effective and that the Company had emerged

from bankruptcy. Defendant Muhlhauser stated as follows:

> "**This is an historic day for Exide** and our global workforce. During the
> past two years, we have maintained our commitment to meeting the
> needs of our customers. **The reorganization process has enabled us to
> resolve financial issues and improve our operations. Exide is now able
> to capitalize on our global network and focus our full capabilities on
> making our customers successful and creating long-term value for our
> shareholders.** With our emergence from Chapter 11, we will continue
> our passion and commitment to quality and innovation to strengthen
> Exide's position as an industry leader in the transportation and industrial
> markets worldwide."

38.    In addition, in the May 5, 2004 press release, Exide stated that:

> [T]he Company implemented a number of cost reduction initiatives
> including the closure or consolidation of certain manufacturing and
> distribution facilities, reductions in workforce and corporate overhead,
> and making quality and productivity improvements through EXCELL,
> the Company's lean supply chain process improvement initiative.

39.    On June 29, 2004, Exide issued a press release announcing its financial

results for its fiscal year 2004, the period ended March 31, 2004. For the year, the

Company reported a net loss of $114.1 million, or $4.17 per diluted share on net sales

of $2.5 billion. Defendant Muhlhauser commented on the Company's 2004 fiscal

year performance, stating, in pertinent part, as follows:

> "During fiscal 2004, **Exide continued execution of our operational
> restructuring initiatives, primarily in Europe, while meeting the needs
> of our customers** despite a delay in our exit from Chapter 11 in North
> America. With our emergence from Chapter 11 in May 2004, **we are
> now able to focus our total efforts on meeting the challenges we face in
> today's market to deliver long-term value to our shareholders.**"

In addition, the June 29, 2004 press release stated:

- 14 -

*[T]he Company continues to streamline and simplify its global operations through a number of cost reduction, quality and productivity initiatives throughout the world. These initiatives involve the closure or consolidation of certain manufacturing and distribution facilities, reduction in salaried personnel, and further improvements in quality and productivity through EXCELL, the Company's lean supply chain process improvement initiative.*

40.    Exide's financial results for its 2004 fiscal year were repeated in the

Company's Report on Form 10-K filed with the SEC on the same day, June 29, 2004.

The June 29, 2004 Form 10-K was signed by defendants Muhlhauser and Harvie. In

the Form 10-K, Exide reported the following financial results for fiscal year 2004:

CONSOLIDATED STATEMENTS OF OPERATIONS
For the Fiscal Year Ended March 31, 2004
(In thousands, except per-share data)

| | |
|---|---|
| Net Sales | $2,500,493 |
| Net Income (Loss) | ($114,083) |
| Inventories | $414,516 |

41.    Exide included in the June 29, 2004 Form 10-K the certification of its

outside auditors that the above *financial results conformed with "accounting*

*principles generally accepted in the United States,"* also known as GAAP.  Exide

further represented in the Form 10-K that its *inventories were "stated at the lower of*

*cost or market."*

42.    Defendants Muhlhauser and Harvie also each signed a certification in the

June 29, 2004 Form 10-K stating the following:

1.    I have reviewed this annual report on Form 10-K of Exide
Technologies;

- 15 -

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.    Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Exide] as of, and for, the periods presented in this report;*

4.    [Exide's] other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) for the [Company] and *we have*:

   a)    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the [Company], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

   b)    *Evaluated the effectiveness of the [Company's] disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and*

   c)    *Disclosed in this report any change in the [Company's] internal control over financial reporting that occurred during the [Company's] most recent fiscal quarter (the [Company's] fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the [Company's] internal control over financial reporting[.]*

43.    The June 29, 2004 Form 10-K also represented that:

- 16 -

As of March 31, 2004, the end of the period covered by this report, the Company, under the supervision and with the participation of the Company's management, including its chief executive officer and interim chief financial officer, performed an evaluation of the effectiveness of the design and operation of its disclosure controls and procedures. *Based on this evaluation, the Company's chief executive officer and interim chief financial officer concluded that, as of such date, the Company's disclosure controls and procedures (a) were effective to ensure that information required to be disclosed by the Company in reports filed or submitted under the Securities Exchange Act of 1934 ("Exchange Act") is timely recorded, processed, summarized and reported and (b) include, without limitation, controls and procedures designed to ensure that information required to be disclosed by the Company in reports filed or submitted under the Exchange Act is accumulated and communicated to management, including its chief executive officer and interim chief financial officer, as appropriate, to allow timely decisions regarding required disclosure.*

44.    Defendants Muhlhauser and Harvie also signed another statement in the

June 29, 2004 Form 10-K stating that:

*The undersigned, as the President and Chief Executive Officer, and Interim Chief Financial Officer, Vice President and Corporate Controller of Exide Technologies, each certify that the Annual Report on Form 10-K for the period ended March 31, 2004, which accompanies this certification, fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934 and the information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of Exide Technologies at the dates and for the periods indicated.*

45.    With respect to the Senior Credit Facility and Credit Agreement, Exide's

June 29, 2004 Form 10-K stated:

The Credit Agreement requires the Company to comply with financial covenants with respect to certain ratios and tests, as defined in the Credit Agreement, including interest coverage, leverage, earnings, asset coverage and capital expenditures. *Although there can be no*

- 17 -

*assurances, the Company believes, based upon its financial forecast and plans, that it will comply with these covenants for the foreseeable future.*

46.    Thereafter, on July 1, 2004, defendants held a conference call discussing

Exide's fiscal 2004 financial results.  In that call, an upbeat defendant Muhlhauser

stated:

*Our financial reorganization has provided Exide with a great foundation for future growth and profitability and I'm extremely excited by the future of our Company.*

\*    \*    \*

*Through operational restructuring initiatives and our EXCELL lean supply chain process improvements, we have improved product quality, reduced costs, enhanced productivity, [and] increased service levels to our customers. . . .*

*Exide is now well positioned to capitalize on . . . making our customers successful [and] creating long-term value for our shareholders.*

\*    \*    \*

*In the near-term, we will drive further improvements to productivity, quality, cost reduction, and customer satisfaction.*

\*    \*    \*

*[W]e are working to continue to reduce costs, improve quality, and reduce lead times to our customers.  We will continue to drive this through our EXCELL lean supply chain initiative, more aggressive supplier procurement initiatives across the Company and further reductions in salaried headcounts and discretionary spending.*

\*    \*    \*

*In closing, we have made significant progress through our financial reorganization to . . . provide a sound foundation for future growth and profitability. . . . [W]e are well-positioned to make sound*

- 18 -

*investments in our future which will create value for our customers and our new shareholders.*

*Exide is very well-positioned to take full advantage of this fresh start.*

47.    In the same conference call on July 1, 2004, defendant Harvie stated that *"we are pleased with the foundation we've laid for future growth opportunities in order to provide value to our shareholders."*

48.    On August 12, 2004, Exide issued a press release announcing its financial results for its first quarter of fiscal 2005, the period ended June 30, 2004.  For the quarter, the Company reported combined (pre and post emergence from bankruptcy) consolidated net income of $1.782 billion on consolidated net sales of $612.5 million. In the press release, defendant Muhlhauser commented on the Company's performance, stating, in pertinent part, as follows:

> *"We have made continued progress this quarter executing our restructuring and strategic growth initiatives . . . . We are focused on strengthening Exide's position as an industry leader and creating long-term value for our shareholders.  The Company remains committed to successfully implementing our restructuring plans while improving our operating cash flow, driving cost reductions, improving quality, developing new business and mitigating the impact of increasing lead prices on our financial results.* Key to our success is Exide's employee commitment to delivering innovative technologies and products and superior service and solutions to our customers worldwide. *We have the financial foundation in place to support our future growth and profitability."*

49.    Exide's financial results for the fiscal first quarter of 2005, the period ended June 30, 2004, were repeated in the Company's Report on Form 10-Q filed with the SEC on the same day as the press release, August 12, 2004.  The Form 10-Q was

- 19 -

signed by defendant Harvie. In the Form 10-Q, Exide reported the following financial

results:

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited, in thousands, except per-share data)

| | |
|---|---|
| Net Sales | $612,535 |
| Net Income (Loss) | $1,782,191 |
| Inventories | $434,603 |

50.    The August 12, 2004 Form 10-Q represented that the *financial results*

*therein had "been prepared in accordance with accounting principles generally*

*accepted in the United States of America,"* or in other words, in accordance with

GAAP.

51.    Defendants Muhlhauser and Harvie also each signed certifications

contained in the August 12, 2004 Form 10-Q stating that:

1.    I have reviewed this Quarterly Report on Form 10-Q of
Exide Technologies;

2.    Based on my knowledge, *this report does not contain any*
*untrue statement of a material fact or omit to state a material fact*
*necessary to make the statements made, in light of the circumstances*
*under which such statements were made, not misleading with respect*
*to the period covered by this report;*

3.    Based on my knowledge, *the financial statements, and*
*other financial information included in this report, fairly present in all*
*material respects the financial condition, results of operations and*
*cash flows of [Exide] as of, and for, the periods presented in this*
*report;*

4.    [Exide's] other certifying officer and I are responsible for
establishing and maintaining disclosure controls and procedures (as

- 20 -

defined in Exchange Act Rules 13a-15(e) and 15d-15(e) for the [Company] and *we have*:

> a.    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Exide], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

> b.    *Evaluated the effectiveness of [Exide's] disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures,* as of the end of the period covered by this report based on such evaluation; and

> c.    *Disclosed in this report any change in [Exide's] internal control over financial reporting that occurred during the most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, [Exide's] internal control over financial reporting*[.]

52.    The August 12, 2004 Form 10-Q also represented the following:

The Company, under the supervision and with the participation of the Company's management, including the Chief Executive Officer and Interim Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in applicable rules of the Securities and Exchange Commission) as of the end of the period covered by this report. *Based on that evaluation, the Chief Executive Officer and Interim Chief Financial Officer, together with the other members of management participating in the evaluation, concluded that the Company's disclosure controls and procedures are effective to ensure that material information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.*

- 21 -

53.    Muhlhauser and Harvie also signed a certification in the August 12, 2004

Form 10-Q that stated:    ·

> The undersigned, as the President and Chief Executive Officer,
> and Interim Chief Financial Officer and Vice President, Corporate
> Controller of Exide Technologies, each certify that . . . *the information
> contained in the periodic report fairly presents, in all material respects,
> the financial condition and results of operations of Exide Technologies
> at the dates and for the periods indicated.*

54.    With respect to the Senior Credit Facility and Credit Agreement, Exide's

August 12, 2004 Form 10-Q stated:

> The Credit Agreement requires the Company to comply with
> financial covenants with respect to certain ratios and tests, as defined in
> the Credit Agreement, including interest coverage, leverage, earnings,
> asset coverage and capital expenditures. *Although there can be no
> assurances, the Company believes, based upon its financial forecast
> and plans, that it will comply with these covenants for the foreseeable
> future.*

55.    Also on August 12, 2004, defendants hosted a conference call with the

investing public in which defendant Muhlhauser stated:

> - *"[O]ur financial reorganization has provided Exide with a
>   sound foundation for future growth and profitability, and I'm
>   excited by the future of our company."*
>
> - "[N]et income for the quarter was $1.782 billion."
>
> - *He was "pleased to report" Exide's "progress" in successfully
>   implementing the fiscal 2005 restructuring plan.*
>
> - *Exide was "on plan and on budget" in its efforts to streamline
>   and simplify the business.*
>
> - *Exide was successfully accelerating its efforts to further reduce
>   costs, improve quality and reduce lead times to customers.*

- 22 -

56.    On October 12, 2004, the Company announced that defendant

Muhlhauser, its President and CEO, would leave the Company on or prior to April 1,

2005. Defendant Muhlhauser stated:

> "It has been my great pleasure serving as Exide's s CEO over the past three years. *The Company is well positioned to expand its global presence in the marketplace, aided in large part by its successful emergence from Chapter 11 bankruptcy proceedings in May.* With the Chapter 11 proceeding behind us, and a new Board of Directors in place, it is time for me to pursue new opportunities. I look forward to working with the Executive Committee and the full Board over the next few months to ensure a proper transition."

57.    On November 15, 2004, Exide issued a press release announcing its

financial results for its fiscal second quarter of 2005, the period ended September 30,

2004. The release stated:

> Consolidated net sales for the second quarter of fiscal 2005 rose 8.5% to $637.6 million from $587.4 million in the second quarter of fiscal 2004. . . .

> Consolidated net loss for the second quarter of fiscal 2005, including restructuring costs of $4.8 million, reorganization costs of $1.7 million and gain on revaluation of warrants liability of $12.1 million, was $17.1 million . . . .

> *        *        *

> Consolidated net sales for the first half of fiscal 2005 rose 6.7% to $1.25 billion from $1.17 billion in the first half of fiscal 2004.

> Consolidated net income for the first half, including Fresh Start accounting adjustments, restructuring costs, reorganization items, gain on revaluation of warrants liability, gain on the discharge of liabilities subject to compromise and cumulative effect of change in accounting principle was $1.77 billion compared to a net loss of $54.3 million in the first half of 2004.

- 23 -

58.     An upbeat defendant Muhlhauser commented in the November 15, 2004

press release on the Company's performance, stating that:

> **"In the second half, we believe the Company will realize additional
> benefits from the lead hedging, pricing actions, restructuring and cost
> reductions implemented in the first half of fiscal year 2005 to mitigate
> the impact of higher lead prices."**

59.     The same day, November 15, 2004, Exide filed its fiscal second quarter

2005 Form 10-Q report with the SEC which included the following financial results:

CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited, in thousands, except per-share data)

| | |
|---|---|
| Net Sales | $637,559 |
| Net Income (Loss) | ($17,101) |
| Inventories | $439,324 |

60.     The November 15, 2004 Form 10-Q was signed by defendants Gargaro

and Harvie and stated that *"the accompanying consolidated financial information*

*includes all adjustments of a normal recurring nature necessary for a fair statement*

*of the results of operations and financial position for the periods presented."*

61.     The November 15, 2004 Form 10-Q also stated the following with

respect to the Senior Credit Facility and Credit Agreement:

> The Credit Agreement requires the Company to comply with
> financial covenants with respect to certain ratios and tests, as defined in
> the Credit Agreement, including interest coverage, leverage, EBITDA,
> asset coverage and capital expenditures.  Principally as a result of the
> dramatic increase in lead costs year on year and the resultant adverse
> impact upon the Company's results, in November 2004 the Company
> was required to obtain amendments to certain financial covenants with

- 24 -

respect to EBITDAR and leverage contained in the Credit Agreement. In addition, the Credit Agreement has been amended with respect to the treatment of proceeds from insurance recoveries. *Although there can be no assurances, the Company believes, taking into account the November 2004 Credit Agreement amendments and based upon its updated financial forecasts and plans, that it will comply with these covenants for the foreseeable future.*

62.    In the November 15, 2004 Form 10-Q, defendants Muhlhauser and

Gargaro each signed certifications representing the following:

      1.    I have reviewed this Quarterly Report on Form 10-Q of Exide Technologies;

      2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact of omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

      3.    Based on my knowledge, *the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Exide] as of, and for, the periods presented in this report;*

      4.    [Exide's] other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13-a-15(e) and 15d-15(e) for the [Company] and *we have:*

            a.    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information related to [Exide], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

            b.    *Evaluated the effectiveness of [Exide's] disclosure controls and procedures and presented in this report our*

- 25 -

*conclusions about the effectiveness of the disclosure controls and procedures,* as of the end of the period covered by this report based on such evaluation; and

c.    *Disclosed in this report any change in [Exide's] internal control over financial reporting that occurred during the most recent fiscal quarter ([Exide's] fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, [Exide's] internal control over financial reporting*[.]

63.    The November 15, 2004 Form 10-Q stated:

The Company, under the supervision and with the participation of the Company's management, including the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in applicable rules of the Securities and Exchange Commission) as of the end of the period covered by this report. *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer, together with the other members of management participating in the evaluation, concluded that the Company's disclosure controls and procedures are effective to ensure that material information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.*

64.    Defendants Muhlhauser and Gargaro also signed a statement in the

November 15, 2004 Form 10-Q certifying that:

The undersigned, as the President and Chief Executive Officer, and Executive Vice President and Chief Financial Officer of Exide Technologies, each certify that . . . *the information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of Exide Technologies at the dates and for the periods indicated.*

65.    The next day, November 16, 2004, Exide hosted an earnings conference

call to discuss its results for the second quarter of fiscal 2005. Defendant Gargaro

- 26 -

stated in the conference call that, based on their updated financial forecasts, Exide

would be in compliance with the amended covenants under the Credit Agreement:

*"Although, there can be no assurances, we believe that taking into account these*

*amendments and based upon our updated financial forecasts and plans, we will*

*comply with these covenants for the foreseeable future."*

      66.    During the November 16, 2004 call, when pressed on that forecast,

defendant Gargaro repeated that Exide was comfortable that its year-end performance

would meet or exceed that required under the financial covenants:

> [Q:] . . . The second question would just deal with the amended
> credit agreement which you disclose as part of the 10-Q calculation. It
> looks as if the annualized amendment to the EBITDAR total numbers is
> off by only about 10 million a quarter. And if I'm doing my calculation
> right, you have generated about 47 million in first-half EBITDAR – I
> think that's what you just announced. And your goal, or the bank's
> credit demands, are 155 million beginning next March. So I guess would
> it be fair to say that your expectation for the business is about 100
> million – 110 million or more in EBITDAR in the second half?

> [A:] . . . [L]et me answer that. I think it's not our objective to
> provide guidance, given the volatility of lead, which today is still trading
> upwards of €747 per metric ton. *However we feel comfortable with the*
> *bank arrangements and the amendment that has been put in-place.*
> *And the relaxing that was done in the EBITDAR calculations was*
> *basically to provide us headroom for the volatility of lead,* a world
> commodity that isn't controllable by the management of the Company,
> except for hedging strategies and pricing actions which are under our
> day-to-day control. You can derive what you want from the covenant.
> But that's our feeling.

      67.    During the same conference call on November 16, 2004, defendant

Muhlhauser touted the cost-cutting initiatives Exide had implemented, assuring

investors that Exide was *"well-positioned to reap the financial benefits"* of its lead

pricing hedging and escalators in the second half of the year:

> *[O]ur cost reduction programs for the first half are on schedule with continued progress on headcount reductions, lean manufacturing initiatives and control of overhead spending generating approximately $20 million in cost savings year-on-year.* We're also continuing to develop plans for *further cost reductions and productivity improvements in manufacturing*, logistics, and purchasing in both North America and Europe.

*    *    *

> [A]s we discussed last quarter, *we continue to accelerate our efforts to further reduce costs, improve quality and improve service and delivery to our customers.* We have initiated additional headcount reductions where appropriate and they will be completed by the end of this fiscal year. *Further cost reductions and productivity improvement in manufacturing, logistics and purchasing have also been identified and specific plans are in development for both North America and Europe. Our progress in this area is also demonstrated by the awards and certifications we received for our quality and service during the quarter.*

68.    On February 9, 2005, the Company issued a press release announcing

that it "intends to offer $350 million aggregate principal amount of senior notes due in

2013. The net proceeds from the note offering are expected to be used to repay a

portion of indebtedness under Exide's senior credit facilities, for general corporate

purposes and to provide Exide with greater liquidity."

69.    On February 14, 2005, Exide issued a press release announcing its fiscal

third quarter 2005 results in which it stated that it had failed to satisfy the Leverage

Ratio Covenant under its Senior Credit Facility and Credit Agreement.    In the

February 14, 2005 press release, Exide assured investors that it "requested and expects

- 28 -

to receive a waiver of the leverage ratio covenant from its lenders, as well as

amendments relating the Company's proposed senior note offering."

72. Exide also reported the following financial results in the February 14,

2005 press release:

> Consolidated net sales for the third quarter of fiscal 2005 rose
> 11.5% to $727.9 million from $653.0 million in the third quarter of fiscal
> 2004. . . .

> Consolidated net loss for the third quarter of fiscal 2005 was
> $439.0 million, or $17.56 per share, compared to a net loss of $9.3
> million, or $0.34 per share, in the third quarter of fiscal 2004.

71. In the February 14, 2005 press release, defendant Muhlhauser provided

the following positive commentary:

- *"The Company will continue its efforts to implement plans and
  make investments to accelerate cost reductions and increase
  cash flow from operations."*

- *"We remain committed to making our customers successful and
  creating long-term value for our shareholders."*

72. On an earnings conference call on the same day, February 14, 2005,

defendant Gargaro updated the public on Exide's apparent improving condition and

stated that he expected the Company's lenders to waive the Leverage Ratio Covenant

and that the reason for the need for the Leverage Ratio Covenant waiver was unrelated

to lower-than-forecasted EBITDA:

> We also mentioned last quarter we had obtained amendments to
> certain financial covenants with respect to adjusted EBITDA and
> leverage contained in our credit agreement. Based on our adjusted
> EBITDA performance this quarter, we are in compliance with that
> covenant.

- 29 -

However, partially because a large percentage of our debt is euro denominated, the continued fall of the dollar against the euro has inflated the value of our debt, so we did not satisfy our leverage ratio covenant as of December 31, 2004 under our senior secured credit facility. We have requested and expect to receive a waiver of the leverage ratio covenant from our lenders, as well as amendments relating to the Company's proposed senior note offering.

\*    \*    \*

We continue to implement operational changes to streamline and rationalize the Company's structure in an effort to simplify the organization and eliminate redundant and/or unnecessary costs.

\*    \*    \*

*During the quarter, our businesses have continued to make progress in driving operational improvements in inventory and receivables* despite the impact of lead on our working capital investment and currency translation, which, combined, have had an impact over the last 12 months of well over 100m in our working capital investment.

*The Company has made tremendous strides, particularly on the inventory and receivables investment, to make progress against these outside factors.* In addition, we continued discussions with our trade suppliers about returning our credit terms to normalized levels.

*Since our adjusted EBITDA have more than doubled from the second quarter,* we believe that our suppliers' continued cooperation and support will contribute to a strengthening of our balance sheet and our liquidity.

73.    In the February 14, 2005 conference call, defendant Muhlhauser stated

that "*we believe we are making progress in*" restructuring Exide and that Exide was

"*accelerat[ing] [its] efforts to reduce costs, improve quality, and improve service and*

*delivery to our customers.*"    Muhlhauser further stated that Exide's "*strategic*

- 30 -

*initiatives are working to establish Exide as the industry leader and positioning us to build on our successes.*"

74.    Also on February 14, 2005, Exide's financial results for the fiscal third quarter of 2005, the period ended December 31, 2004, were repeated in the Company's Report on Form 10-Q filed with the SEC, which was signed by defendants Gargaro and Harvie. The Form 10-Q contained the following financial results:

### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited, in thousands, except per-share data)

| | |
|---|---|
| Net Sales | $727,902 |
| Net Income (Loss) | ($402,441) |
| Inventories | $460,239 |

75.    The February 14, 2005 Form 10-Q stated the following with respect to the Senior Credit Facility and Credit Agreement:

> Principally as a result of the dramatic increase in lead costs year on year and the resultant adverse impact upon the Company's results, in November 2004, the Company was required to obtain amendments to certain financial covenants with respect to earnings before interest, taxes, depreciation, amortization and restructuring ("EBITDAR") and leverage contained in its Senior Secured Credit Facility (the "Credit Agreement"). Due to the fact that the Company failed to satisfy its leverage ratio covenant as of December 31, 2004 under the Credit Agreement, in February 2005, the Company received a waiver of the leverage ratio covenant from its lenders, as well as amendments relating to the Company's proposed senior note offering. *Although there can be no assurances, the Company believes, taking into account the Credit Agreement amendments and based upon its updated financial forecasts and plans, that it will comply with the covenants contained in its Credit Agreement for the foreseeable future.*

- 31 -

76.    In the February 14, 2005 Form 10-Q, defendants Muhlhauser and

Gargaro each signed certifications representing the following:

1.    I have reviewed this Quarterly Report on Form 10-Q of
Exide Technologies.

2.    Based on my knowledge, *this report does not contain any
untrue statement of a material fact or omit to state a material fact
necessary to make the statements made, in light of the circumstances
under which such statements were made, not misleading with respect
to the period covered by this report*;

3.    Based on my knowledge, *the financial statements, and
other financial information included in this report, fairly present in all
material respects the financial condition, results of operations and
cash flows of [Exide] as of, and for, the periods presented in this
report*;

4.    [Exide's] other certifying officer and I are responsible for
establishing and maintaining disclosure controls and procedures (as
defined in Exchange Act Rules 13a-15(e) and 15d-15(e) for the
[Company] and *we have*:

a.    *Designed such disclosure controls and procedures,
or caused such disclosure controls and procedures to be
designed under our supervision, to ensure that material
information relating to [Exide], including its consolidated
subsidiaries, is made known to us by others within those entities,
particularly during the period in which this report is being
prepared*;

b.    *Designed such internal controls over financial
reporting, or caused such internal controls over financial
reporting to be designed under our supervision, to provide
reasonable assurance regarding the reliability of financial
reporting and the preparation of financial statements for
external purposes in accordance with generally accepted
accounting principles*;

c.    *Evaluated the effectiveness of [Exide's] disclosure
controls and procedures and presented in this report our*

- 32 -

*conclusions about the effectiveness of the disclosure controls and procedures*, as of the end of the period covered by this report based on such evaluation; and

      d.    *Disclosed in this report any change in [Exide's] internal control over financial reporting that occurred during the most recent fiscal quarter ([Exide's] fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, [Exide's] internal control over financial reporting[.]*

77.    The February 14, 2005 Form 10-Q also stated the following:

    The Company, under the supervision and with the participation of the Company's management, including the Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in applicable rules of the Securities and Exchange Commission) as of the end of the period covered by this report. ***Based on that evaluation, the Chief Executive Officer and Chief Financial Officer, together with the other members of management participating in the evaluation, concluded that the Company's disclosure controls and procedures are effective*** *to ensure that material information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.*

*   *   *

    *We are currently reviewing and documenting our internal control processes and procedures and have begun testing such controls. This process has identified certain controls and areas of our control environment in which we need to undertake remediation efforts.* Due to the number of controls to be examined, the complexity of the project, the time and effort required to complete remediation and the subjectivity in determining the effectiveness of controls and the significance of deficiencies, we can not be certain at this time that all of our controls will be documented and tested or that such controls will be considered effective by management, or if considered effective by our management, that our auditors will agree with such assessment.

- 33 -

Management is working to complete all testing and remediation within the Sarbanes Oxley Act deadline.

78.    Defendants Muhlhauser and Gargaro also signed a statement in the February 14, 2005 Form 10-Q certifying that:

> The undersigned, as the President and Chief Executive Officer, and Executive Vice President and Chief Financial Officer of Exide Technologies, each certify that . . . *the information contained in the periodic report fairly presents, in all material respects, the financial condition and results of operations of Exide Technologies at the dates and for the periods indicated.*

79.    On February 28, 2005, Exide filed a Form 8-K with the SEC in which it disclosed that it had completed a Third Amendment to its Senior Credit Facility and Credit Agreement on February 24, 2005. The Amendment revised the Senior Credit Facility and Credit Agreement financial covenants, including a revised EBITDA Covenant of $122 million (lowered from $155 million) for the 12-month period ending March 31, 2005.

80.    On March 10, 2005, Exide announced in a press release that it would be offering $60 million of floating rate convertible senior subordinated notes in partial replacement of its previously-announced offering of senior notes.

81.    On March 15, 2005, Exide priced $290 million principal amount of the 10-1/2% senior notes and $60 million principal amount of the convertible senior subordinated notes.

82.    Also on March 15, 2005, the Company issued a press release announcing

that it completed the pricing of its senior note offering and its convertible note

offering. The press release continued, in pertinent part, as follows:

> The offerings consist of two tranches: $290 million in 10 1/2%
> senior notes, secured by a junior lien; and $60 million in Floating Rate
> Convertible Senior Subordinated Notes, with an initial rate of 1.53% and
> with a $9 million green shoe. The convertible notes will be convertible
> into stock of the Company at a $17.37 conversion price. Both notes will
> come due in 2013.
>
> Exide plans to use the proceeds from a successful offering to
> reduce the Company's bank indebtedness, provide greater liquidity,
> continue restructuring efforts to improve the Company's cost structure,
> and for general corporate purposes.

**THE TRUE FACTS WHICH DEFENDANTS CONCEALED
AND WHICH CONTRADICTED THEIR PUBLIC STATEMENTS**

83.    The statements referenced above in ¶¶37-67 and 70-78 were each

materially false and misleading when made because defendants concealed and failed

to disclose the following adverse facts below. These facts were known to defendants,

or recklessly disregarded by them, at all relevant times.

**THE TRUE FACTS CONCERNING EXIDE'S
FALSE FINANCIAL STATEMENTS**

84.    Exide's reported financial results during the Class Period were false, as

defendants had intentionally or recklessly overstated the Company's inventories and

net income (and understated its net losses) by failing to properly account for excess

and obsolete inventory.

- 35 -

85.    Exide reported the following financial results during the Class Period:

|  | Fiscal Year Ended March 31, 2004 | First Fiscal Quarter Ended June 30, 2004 | Second Fiscal Quarter Ended September 30, 2004 | Third Fiscal Quarter Ended December 31, 2004 |
|---|---|---|---|---|
| Net Sales | $2,500,493,000 | $612,535,000 | $637,599,000 | $727,902,000 |
| Net Income (Loss) | ($114,083,000) | $1,782,191,000 | ($17,101,000) | ($402,441,000) |
| Inventories | $414,516,000 | $434,603,000 | $439,324,000 | $460,239,000 |

86.    Exide included these results in its SEC Form 10-K for the fiscal year

ended March 31, 2004 (which was filed on or about June 29, 2004), and its SEC

Forms 10-Q which were filed on or about August 12, 2004, November 15, 2004, and

February 14, 2005. Defendants Muhlhauser and Harvie signed the Form 10-K. The

August 12, 2004 Form 10-Q was signed by defendant Harvie, and the November 15,

2004 and February 14, 2005 Forms 10-Q were signed by defendants Harvie and

Gargaro.

87.    These financial statements, and the statements about them, were false and

misleading, as such financial information was falsified, was not prepared in

conformity or in accordance with GAAP, and did not fairly present in all material

respects the financial condition of Exide, due to defendants' improper accounting for

inventory in violation of GAAP and SEC rules.

88.    GAAP are those principles recognized by the accounting profession as

the conventions, rules and procedures necessary to define accepted accounting

practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that

financial statements filed with the SEC which are not prepared in compliance with

- 36 -

GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

89.    Throughout the Class Period, Exide failed to make timely and adequate accruals for losses on obsolete inventory, thereby materially overstating its reported net income and inventory, and understating the magnitude of its reported net losses. Had Exide properly recorded accruals for obsolete inventory, its costs of sales during the Class Period would have been higher, and its EBITDA would have been lower. As a result, the Company's reported net losses during the Class Period would have been greater and its reported Class Period net income and inventories would have been lower.

90.    GAAP, as set forth in Accounting Research Bulletin ("ARB") No. 43, Chapter 4, Inventory Pricing, requires that inventories be recorded at the lower of cost or market. ARB No. 43, Chapter 4, Statement 5, states:

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss in the current period. This is generally accomplished by stating such goods at a lower level commonly designated as *market*.

- 37 -

91.    Exide represented in its Form 10-K filed during the Class Period that its inventories were "stated at the lower of cost or market."

92.    In fact, however, Exide did not report its inventory at the lower of cost or market. The Company failed to properly report its inventory during the Class Period to account for obsolete inventory. According to a former Exide employee who worked at the Company from July 2001 through September 2004 as a Cost Accountant, Financial Analyst and Treasury Analyst (hereinafter "Confidential Informant #8" or "CI#8") -- who just prior to the Class Period was performing an analysis of obsolete and old inventory for the entire Company and was trying to identify means for disposing of it -- Exide had accumulated millions of dollars in excess and obsolete inventory by early 2004, and the amount was increasing. Indeed, according to CI#8, because Exide had such a large and persistent excess and obsolete inventory problem, the Company had hired an outside consultant to help determine ways to reduce such inventory. CI#8 prepared reports called "Obsolete Inventory Reports," that quantified the amounts of excess and obsolete inventory. Such reports were distributed to the outside consultant and defendant Muhlhauser, among others, after which they and CI#8 would have conference calls to discuss the issue. During these calls, the outside consultant repeatedly emphasized to Muhlhauser and the other call participants that the inventory needed to be written off, yet no write off was taken. According to CI#8, the old and obsolete inventory was being carried at its higher "cost" value in Exide's financial statements, which it should not have been because

- 38 -

the "market" value was lower. This was in violation of GAAP and did not fairly present in all material respects the financial condition of Exide.

93.    Exide continued to carry this excess and obsolete inventory in its financial statements at improperly inflated values into and during the Class Period. This resulted in Exide reporting inflated inventories and net income, and understated net losses, during the Class Period. According to a former Executive Assistant to the President of Exide's North America Transportation division, one of Exide's largest revenue generating divisions (hereinafter "CI#1"), throughout the Class Period, Exide was continuing to accumulate more excess and obsolete inventory. This was so because the North American Transportation division's sales forecasts were never met, which resulted in numerous batteries – which were manufactured in anticipation of the Company meeting the sales forecasts – never being sold. CI#1 knew this because she prepared the North American Transportation division's "Weekly Report" which forecasted the division's sales and compared them to its actual sales. The "Weekly Report" was sent to Muhlhauser every week. CI#1 worked for Exide throughout the entire Class Period until June 2005.

94.    Moreover, according to a former Exide employee who worked for the Company from May 1994 until January 2005 and whose simultaneous job titles were Production Manager, Logistics Manager and Superintendent for Exide's Bristol, Tennessee plant ("CI#6"), the plant was "over-building" batteries and it was visibly obvious that there were "more batteries in the warehouse than we were shipping out."

- 39 -

95.    In addition, a former "Lean Agent" for Exide – who was responsible for implementing the EXCELL lean manufacturing practices at the Company from May 2003 until October 2004, and who was trying to implement inventory reduction procedures during the Class Period ("CI#7") – personally observed "tons" of excess and obsolete inventory in Exide's plants and distribution centers. CI#7 observed excessive amounts of inventory at the Bristol, Tennessee, Fort Smith, Arkansas, and Salina, Kansas, plants. In addition, according to CI#7, at some of the Company's distribution centers there was so much excess inventory that it was being stacked on the floors, even though this was prohibited, because there was nowhere else to store the unsold batteries.

96.    Apparently in an effort to rid themselves of obsolete inventory, Exide's distribution centers shipped poor quality batteries which could not be sold to Exide's branch offices, according to a former Exide employee who worked for the Company as a Regional Support Manager from December 2004 until August 2005 and who dealt with Exide's branch offices ("CI#4").

97.    Exide was required to record this inventory at the lower of cost or market by GAAP. This meant that Exide was required to record adequate losses through inventory reserves to reflect this impaired inventory, but did not do so in order to overstate reported net income and understate reported net losses. Exide's inventory was reported to be $414,516,000 at March 31, 2004 (the end of fiscal year 2004), $434,603,000 at June 30, 2004 (the end of the first quarter of fiscal 2005),

- 40 -

$439,324,000 at September 30, 2004 (the end of the second quarter of fiscal 2005),

and $460,239,000 at December 31, 2004 (the end of the third quarter of fiscal 2005).

Due to Exide's failure to record adequate and timely reserves for excess and obsolete

inventory, Exide's reported inventory was materially overstated during the Class

Period. Under GAAP, a reduction in inventory must be accompanied by a reduction

to income. This is so because under ARB No. 43, Chapter 4, Statement 5, GAAP

requires that, "in accounting for inventories, a *loss* should be recognized whenever the

utility of goods is impaired by . . . obsolescence . . . . The measurement of such *loss[]*

is accomplished *by applying the rule of pricing inventories at cost or market,*

*whichever is lower*."

98.     At the end of the Class Period, Exide recorded an inventory write off to

belatedly account for its overvalued inventory during the Class Period. On May 17,

2005, Exide announced an inventory write down of $4.5 million for obsolete

inventory for physical inventory adjustments.

99.     Due to these accounting improprieties with respect to inventories and net

income/loss, the Company presented its financial results and statements in a manner

which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon

the same accounting principles and practices used to prepare annual financial

statements was violated (APB No. 28, ¶10);

- 41 -

(b)    The principle that financial reporting should provide information that is useful to present and potential investors, creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change those resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

- 42 -

(f)    The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable, as well as relevant, is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

100.    Further, the undisclosed adverse information concealed by defendants during the Class Period – improper valuation of obsolete inventory – is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

- 43 -

### THE TRUE FACTS CONCERNING DEFENDANTS' FALSE STATEMENTS THAT EXIDE HAD SUFFICIENT INTERNAL CONTROLS IN PLACE

101.    Contrary to defendants' representations in SEC filings that Exide had sufficient internal controls and procedures to ensure the proper reporting of material information in a timely manner, Exide's internal controls and procedures over financial reporting were not designed or effective to ensure that material information required to be disclosed was properly reported.  In fact, Exide's internal controls and procedures were so deficient and so seriously lacking that Exide could not accurately account for its existing inventories, could not generate accurate and timely invoices to customers, and could not accurately forecast its sales and future inventory needs.  This resulted in Exide's financial statements being unreliable and inaccurate.

102.    For example, according to a former employee of Exide, who was employed from August 2004 until January 2005 as a Government Sales Administrator, and who was responsible for monitoring a contract Exide had with the United States government and accounting for the inventory under that contract (hereinafter "CI#5"), Exide had absolutely no controls in place to ensure that it could accurately account for the number of batteries it was required to keep on hand under the contract.  Pursuant to the contract, Exide was required to maintain a certain number of batteries at various locations throughout the United States for the government's use on an "as needed" basis.  According to CI#5, it was impossible to keep track of the number of batteries on hand as Exide had no system in place at each location to track how many batteries

- 44 -

were on hand, how many were used by the government, or when and how many batteries were rotated in or out due to expiration issues (batteries have a shelf life of 12 to 18 months). CI#5 was informed by coworkers that this system, or more accurately the lack thereof, had existed for years, and that in years past when a count was required by the government Exide had fabricated the reported number of batteries on hand by simply reporting as on hand whatever the contract called for there to be on hand.

103.   Based on what CI#5 found in her accounting, Exide's inventory numbers were so flawed and inaccurate that Exide had no basis for supporting any numbers revenue-wise that it reported related to the government battery contract.

104.   Defendant Harvie was aware of the situation, as in December 2004 he participated in a conference call with CI#5 and Exide employee Joseph Barnes wherein he was informed of this problem. During the call, Harvie stated: "If that inventory is gone how can we possibly account for other materials?" This was an admission of the utter lack of internal controls at Exide.

105.   Similarly, according to CI#4, who worked at and with Exide's branch stores, the same problem existed at the Company's branch stores – there were always fewer batteries at the branches than Exide's inventory records indicated.

106.   Furthermore, as discussed below in ¶¶123-126, Exide's internal controls were also so defective that its J.D. Edwards billing systems frequently did not even generate invoices and send them to customers when products were shipped.

- 45 -

According to CI#5, the J.D. Edwards System was completely incapable of generating invoices for government orders and also was unable to correctly invoice Exide's largest customer, Napa Auto Parts. In addition, when invoices were generated by the J.D. Edwards system, they were frequently inaccurate.

107.   According to a former Exide employee who had worked at the Company for over 15 years (ending her employment on December 31, 2004) (hereinafter "CI#2"), in many cases Exide would not even realize that it had failed to bill the customer until many months after it had shipped product, and was therefore required to go back and manually create a bill and send it months after-the-fact. Many of the manual invoices were also inaccurate as Exide did not have internal procedures and controls in place to determine the amount of product that had been shipped, according to CI#2. This led to many dissatisfied customers and billing disputes, according to CI#2, as the passage of time and lack of internal controls made it difficult or impossible to confirm that Exide had shipped product. CI#2 was in a position to know the foregoing because during the portion of her employment during the Class Period, CI#2 simultaneously held three job titles at Exide's Reading, Pennsylvania facility – Customer Service Representative, Billing Analyst and Export Compliance Officer. In these capacities, CI#2 was responsible for responding to customer complaints, correcting and resolving billing issues and generally ensuring that customer needs were met.

- 46 -

108.   Exide also had no ability to make accurate sales and future inventory needs forecasts and no internal controls or procedures to ensure any degree of accuracy in such forecasts. According to CI#1 (the former Executive Assistant to the President of Exide's North American Transportation division), at no time during the Class Period did one of Exide's largest revenue-generating divisions -- the North American Transportation division -- come anywhere close to attaining its sales forecasts, even after its forecasts were lowered. In addition, the consistently grossly inaccurate sales forecasts were used to forecast future inventory needs. According to CI#1, the sales forecasts drove the inventory forecasts. If the sales forecasts projected a large number of sales, the inventory forecasts projected the need to make a large number of batteries to meet the sales needs. Unfortunately, because the sales forecasts never materialized, Exide manufactured numerous batteries in anticipation of forecasted sales which never materialized. Thus, according to CI#1, Exide manufactured numerous batteries that it could not sell. This is corroborated by Exide's former Vice President of Finance for the North American Transportation division from the spring of 2004 until November 2004 ("CI#9"). According to CI#9, Exide over-produced batteries because the Company's forecasted sales never materialized.

109.   According to CI#4 (the former Regional Support Manager to Exide's branch offices), the same thing happened at Exide's branch level -- the branches never met sales forecasts and therefore Exide manufactured many unsalable batteries.

- 47 -

110.    And, according to CI#6 (a former manager at the Bristol plant), the same thing occurred at the Bristol plant – he observed the plant "over-building" batteries and it was visibly obvious that there were more batteries in the warehouse than were being shipped out.  The Bristol plant Materials Manager, Gary Shaw, complained to CI#6 throughout the Class Period that Exide's sales and inventory forecasting was extremely inaccurate.

111.    According to CI#7 (the former "Lean Agent"), part of his implementation of the EXCELL lean principles involved the attempt to reduce excess inventory throughout the Company.  In the course of this unsuccessful attempt, he personally observed excessive quantities of inventory that had accumulated because of inaccurate forecasting.  He personally observed literally "tons" of excess inventory at the Bristol, Fort Smith and Salina plants.  He also personally observed so much excess inventory stored at some plant distribution centers because of inaccurate forecasting that inventory was stacked on the floors even though this was prohibited.  The excess inventory was stacked on the floors because there was so much that there was no where else to put it.  According to CI#7, Exide's inventory controls and processes were in need of extreme improvement as it took weeks to get inventory-related data that was needed to accurately manufacture orders.  The delay in obtaining such information made it impossible for Exide to execute "build-to-order" initiatives implemented under the EXCELL lean programs.

- 48 -

112.   Finally, according to CI#8, in the months before the Class Period, she was tasked with analyzing Exide's obsolete and old inventory.  During her work she discovered that the Company had tens of millions of dollars of excess and obsolete inventory that had accumulated directly because of Exide's exaggerated sales forecasts.  Thus, Exide had accumulated tens of millions of dollars in excess and obsolete inventory even prior to the Class Period that continued through into the Class Period.

113.   Given the gross lack of internal controls and procedures described above, even defendants' February 14, 2005 statement in Exide's Form 10-Q, that certain of Exide's internal controls needed remediation efforts but were effective, was false.  Exide had extremely deficient or non-existent controls in place and it was clearly evident within the Company that such controls were completely ineffective.

114.   Not only were defendants' statements about internal controls false, they also violated the Exchange Act.

115.   Section 13(b)(2) of the Exchange Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary [] to permit preparation of financial statements in conformity with [GAAP]."  These provisions require an issuer to employ and supervise reliable

- 49 -

personnel, to maintain reasonable assurances that transactions are executed as authorized, to record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets.

116.    As alleged above, defendants Muhlhauser, Harvie and Gargaro each signed certifications in Exide's SEC Forms 10-K and 10-Q filings stating the following:

> 4.    [Exide's] other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e) for the [Company] and *we have*:
>
> > a.    *Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the [Company], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*
> >
> > b.    *Evaluated the effectiveness of the [Company's] disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures,* as of the end of the period covered by this report based on such evaluation; and
> >
> > c.    *Disclosed in this report any change in the [Company's] internal control over financial reporting that occurred during the [Company's] most recent fiscal quarter (the [Company's] fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the [Company's] internal control over financial reporting*[.]

117.    Defendants also represented that:

- 50 -

The Company, under the supervision and with the participation of the Company's management, including the Chief Executive Officer and Interim Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in applicable rules of the Securities and Exchange Commission) as of the end of the period covered by this report. ***Based on that evaluation, the Chief Executive Officer and Interim Chief Financial Officer, together with the other members of management participating in the evaluation, concluded that the Company's disclosure controls and procedures are effective to ensure that material information required to be disclosed by the Company in the reports that it files or submits under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms.***

118.    These representations were not only false as Exide's disclosure controls and procedures were not effective, as alleged above, they also violated §13(b)(2)(A) of the Exchange Act by failing to maintain adequate internal controls in order to ensure that its financial statements were prepared in conformity with GAAP and that its public filings were accurate.

119.    Exide subsequently admitted that its disclosure controls and procedures during the Class Period were inadequate. The Company's Form 10-K filed on June 29, 2005 stated in part:

As of the end of the period covered by this report, the Company carried out an evaluation, under the supervision and with the participation of senior management, including the chief executive officer and the chief financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Exchange Act Rules 13a-15(b) and 15d-15(b). Based upon, and as of the date of this evaluation, the chief executive officer and the chief financial officer concluded that our disclosure controls and procedures were not effective, because of the material weaknesses discussed below.

- 51 -

\*     \*     \*

- Ineffective controls over period-end account reconciliations, reviews and analyses. At March 31, 2005, *we did not maintain effective controls over period-end account reconciliations, reviews and analyses. Specifically, our account reconciliations, reviews and analyses procedures were ineffective as it relates to the following: (i) independent and timely review of certain account reconciliations and analyses, including those over cost of sales, inventories, accrued expenses and operating expenses; (ii) review and approval of journal entries; and (iii) timely business performance reviews of financial results. These control deficiencies resulted in audit adjustments to the aforementioned accounts in the Company's fiscal 2005 consolidated financial statements.* Additionally, these control deficiencies could result in a misstatement in financial statement accounts and disclosures that would result in a material misstatement to the annual or interim financial statements that would not be prevented or detected. Accordingly, management has determined that these control deficiencies, in the aggregate, constitute a material weakness.

120.     Exide's lack of adequate internal controls rendered its Class Period

financial reporting inherently unreliable and precluded the Company from preparing

financial statements that complied with GAAP. Nonetheless, throughout most of the

Class Period, the Company regularly issued quarterly and annual financial statements

without ever disclosing the existence of the significant and material deficiencies in its

internal accounting controls (in fact, defendants represented that such controls were

effective) and falsely asserted that its financial statements complied with GAAP. In

addition, even when Exide did disclose, on February 14, 2005, that the Company had

identified certain controls that needed remediation efforts, it still falsely stated the

controls were effective and failed to disclose that the controls were actually ineffective

and essentially non-existent as described more fully above.

- 52 -

### THE TRUE FACTS CONCERNING DEFENDANTS' FALSE
### STATEMENTS THAT THEY WERE SUCCESSFULLY
### RESTRUCTURING EXIDE

121.    Contrary to defendants' statements that they were successfully restructuring Exide – by strengthening Exide's competitive position, streamlining, simplifying and improving its operations, and reducing its costs, while making quality and productivity improvements – such restructuring was a complete failure.

122.    According to CI#2 (a former Customer Service Representative, Billing Analyst and Export Compliance Officer at Exide's Reading, Pennsylvania facility), the Company's efforts to restructure were a dismal failure. According to CI#2, before the Class Period began, in April 2004, Exide started a major restructuring which involved closing the Company's Reading, Pennsylvania facility, where customer service and billing operations were handled. These functions were transferred to Exide's Alpharetta, Georgia facilities. While the purported reasons for this transfer were that Exide would realize significant cost savings and increased levels of customer service, according to CI#2, neither occurred. In fact the opposite happened. According to CI#2, costs increased and customer service deteriorated.  Costs increased because, instead of having one person like CI#2 in Reading handling both customer service and billing for a customer, Exide now had a total of four individuals in Alpharetta handling what one person in Reading had previously handled alone, while the Alpharetta employees were each receiving 7% more in salary than their

- 53 -

Reading counterparts (CI#2 learned this from internally-posted job positions by the Company).

123.  Customer service also deteriorated significantly for two reasons, according to CI#2.  First, Exide had not hired employees in Alpharetta with any customer service experience and therefore they did not know how to handle their job responsibilities.  Second, as part of Exide's restructuring, the Company had recently migrated its computer operations to a J.D. Edwards software system.  According to CI#2, the J.D. Edwards system was supposed to have a function that would automatically generate customer invoices.  Nonetheless, the system was frequently unable to perform customer invoicing.

124.  According to another former Exide employee, who was responsible for invoicing on Exide's government contracts until she left the Company in October 2004 (hereinafter "CI#3"), even when the J.D. Edwards system did create invoices they were incorrect.  In addition, the system caused orders to be delivered up to eight to ten weeks late, infuriating Exide's customers.

125.  According to CI#4, the J.D. Edwards system also resulted in numerous other errors.  CI#4 was responsible for helping Company branch employees use and resolve issues in the J.D. Edwards system.  During the course of fulfilling her responsibilities, CI#4 became aware that the J.D. Edwards system gave customers too large of discounts or even gave product away for free many times, while many other

- 54 -

times it failed to give customers proper promotional discounts, or priced products incorrectly.

126.  According to CI#2, the pervasive problems with the J.D. Edwards invoicing system upset many customers as they wanted to receive accurate and timely bills to properly accrue their accounts payable and receive product on a timely basis. In addition, according to CI#2, in the instances where Exide subsequently manually billed the customers that the J.D. Edwards system had missed, the manual bills were often inaccurate, further infuriating customers.  Large Exide customers such as the United States government and Volkswagen became very upset with these issues and canceled contracts with Exide.

127.  According to CI#6, the EXCELL lean program – another restructuring initiative which was designed to improve manufacturing and reduce costs – was not being successfully executed and was leading to higher, instead of lower, costs. According to CI#6, the implementation was being met with resistance as Exide employees received incentive compensation for *high*-volume production while the EXCELL lean system mandated the manufacture of *smaller* quantities.  In addition, employees were forced to work seven days a week in order to meet the requirements of the new program, which caused increased costs, according to CI#6.

128.  CI#7, the former "Lean Agent," who was responsible for implementing the EXCELL lean manufacturing processes during part of the Class Period, corroborated CI#6's assertion that implementation of the program was unsuccessful

- 55 -

because of resistance, particularly from middle management. According to CI#7, Exide employees frequently resisted his efforts to implement the lean processes. According to CI#7, representations that Exide was having success and making progress in its lean manufacturing endeavors were half-truths, as at many plants, such as those located in Bristol, Fort Smith and Salina, as well as those in France, Poland and Germany, the implementation of lean principles was going "horribly."

### THE TRUE FACTS CONCERNING A CONTRACT WITH A LARGE NORTH AMERICAN CUSTOMER ARE CONCEALED BY DEFENDANTS AND NOT DISCLOSED

129.    According to CI#5, Exide was aware in December 2004 that it would have to write off approximately $1.4 to $2.8 million on a contract it had with the United States government.  CI#5 knew this because she was responsible for monitoring this contract and accounting for its inventory.  Under the contract, Exide was required to maintain a three-month supply of batteries at various locations throughout the United States for the government's use on an "as needed" basis.  While the contract called for a total of about 23,000 batteries to be maintained at the locations, CI#5 had conducted a review which she shared with defendant Harvie.  As of December 2004, there were less than 5,000 batteries on hand.  Thus, according to CI#5, it was clear as early as December 2004 that Exide would be required to adjust and write down the amount of the contract by $1.4 to $2.8 million because of the 18,000 missing batteries.

- 56 -

**THE TRUE FACTS CONCERNING DEFENDANTS' FALSE
STATEMENTS THAT EXIDE'S EMERGENCE FROM BANKRUPTCY
HAD POSITIONED THE COMPANY FOR SUCCESS**

130.    Contrary to defendants' statements that Exide's emergence from and

reorganization in bankruptcy had enabled the Company to resolve its financial issues,

improve its operations, provide a great foundation for future growth, and focus on

creating long-term shareholder value, the truth was that Exide was actually in *worse*

*shape* after exiting bankruptcy than it had been in before entering bankruptcy.  From

the time Exide exited bankruptcy through the end of the Class Period, the Company

was very unstable and its financial condition was deteriorating, according to CI#1 (the

former Executive Assistant to the President of Exide's North American Transportation

division).  The North American Transportation division was one of Exide's largest

revenue-generating business segments and according to CI#1, throughout the entire

Class Period, she received information from within the North American

Transportation segment and entered it into a report, known as the "Weekly Report,"

which, after being reviewed by her boss, she sent to defendant Muhlhauser each week.

The reports set forth the forecasted sales for the segment and compared them to the

actual sales attained.  According to CI#1, the North American Transportation division

failed to reach its sales forecasts every single month during the Class Period.

According to CI#1, the Weekly Reports submitted to Muhlhauser showed that the

division's performance was "not a pretty picture," as the division "wasn't even close"

to attaining its sales forecasts.  And even after the division had its sales goals lowered

- 57 -

based on poor sales performance, the division still could not meet even the lowered sales goals.

131.   In addition, according to CI#1, Exide was in worse shape and unstable emerging from bankruptcy because the Company was constantly changing executives. According to CI#1, each new executive change brought about a brand new series of regroupings and restructurings, which consumed time and resources, and which never allowed the Company to operate on a steady track.  Other former Exide employees concurred.  For example, according to CI#9 (the former Vice President of Finance for the North American Transportation division), Exide's finance and accounting departments experienced a great deal of turnover amongst both high-ranking and lower-level personnel during the Class Period which contributed to deficient "checks and balances" in those departments and Exide's accounting.

132.   In addition, according to CI#8, employee morale was extremely low and most of the experienced, talented people had left the Company while those less-talented people who remained "were overwhelmed and under-qualified" to deal with the "lots of big problems" facing Exide.  Problems experienced by the Bristol plant were also caused by management turnover, according to CI#6, a former manager in Bristol.

### THE TRUE FACTS CONCERNING DEFENDANTS' FALSE
### STATEMENTS THAT EXIDE WOULD COMPLY WITH
### THE SENIOR CREDIT FACILITY COVENANTS

133.   As set forth above in ¶¶84-132, Exide was a company that was declining

rapidly and which was not performing well financially, all of which was being

covered up by defendants' falsification of Exide's financial results.   Because of the

foregoing, which defendants were aware of, they had no basis to represent that Exide

would comply with the Leverage Ratio Covenant and EBITDA Covenant under the

Credit Agreement and Senior Credit Facility.   In short, the foregoing adverse events

within Exide made it clear to defendants that Exide was going to violate such

covenants. In addition, Exide's statements that "based upon its financial forecast and

plans" it would comply with the Covenants were false and misleading because

defendants were aware that Exide had such a lack of internal financial controls that it

had no ability to accurately forecast its future performance.

### THE TRUTH EMERGES

134.   On May 16, 2005, after the markets closed, the Company issued a press

release announcing that it expected to be in violation of its EBITDA and Leverage

Ratio Covenants in the Senior Credit Facility and Credit Agreement as of and for the

fiscal year ended March 31, 2005. The press release continued, in pertinent part as

follows:

> The Company estimates that its adjusted EBITDA for the fiscal
> year ended March 31, 2005 will be in the range of $100-107 million. The
> expected covenant issues primarily relate to the impact of commodity

costs; the loss of overhead absorption due to an inventory-reduction initiative; other fourth-quarter inventory valuation adjustments; and costs associated with Sarbanes-Oxley compliance efforts. Exide executives will discuss these items on a conference call with the investment community at 4 p.m. Eastern Daylight Saving Time on Tuesday, May 17.

135. Market reaction to this announcement was swift and severe. The price of Exide stock, which had closed at $11.15 per share on May 16, 2005, fell to an opening price of $5.75 per share the following trading day, May 17, 2005, representing a one-day decline of $5.40, or 48%, and closed out the day at $6.88 per share on extremely heavy volume of over 18 million shares, over 50 times the daily average volume.

136. Later in the day on May 17, 2005, defendants held a conference call. In the call defendant Gargaro stated:

> Under our credit agreement our minimal EBITDA requirement for the quarter is 130 million, which includes a test period benefit of approximately 8 million, indicating that we need to be in a range of 122 million. As we announced, we expect adjusted EBITDA to be in the range of 100 to 107 million. In terms of our leverage test the expected covenant issue was a result of this lower EBITDA level not because of the amount of debt that the Company had on its balance sheet. . . .

> *Several unanticipated or unusual items impacted our preliminary results during the quarter in the range of 15 to 20 million. Those items include inventory write-offs of approximately 4.5 million related to obsolescence adjustments and physical inventories which were a result of the year-end process. Of this amount, 2 million was the result of noncash obsolescence charges in Europe, resulting from ongoing SKU reduction efforts and discontinued product lines. We have initiated more clearly, defined procedures to ensure that we better manage these issues going forward to minimize the financial impact of these ongoing efforts. We also continue to refine our inventory cycle counting processes and other control enhancements as a means of earlier identification of inventory issues.*

- 60 -

*The Company had forecast inventory reductions in the fourth quarter. But clearly not to the levels we ultimately achieved.* In March alone we reduced consolidated inventories by over 30 million. Compared with the same quarter last year the reduction was even more pronounced. *The result being a $6 million loss of absorbed overhead cost. That said, we are not satisfied and we are improving our forecasting capabilities and forward visibility. We are implementing a more structured forecasting methodology that better connects sales and production planning cycles and we expect to have these more robust processes in place within the next 30 to 45 days.* Our goal from these efforts is to drive even greater management accountability.

. . . Finally, *we have recorded adjustments of approximately 1.5 to $2 million to reconcile pricing and commercial items in accordance with contractual provisions applying to a large customer in North America. While we are disappointed in the weakness in our checks and balances, in this instance,* we believe the controls we have in place are appropriate. We also believe we have made appropriate personnel changes to assure that our controls function as intended going forward.

137.    In reaction to this news, the price of Exide shares fell another $1.55, or 22%, from their closing price of $6.88 on May 17, 2005, to close at $5.33 on May 18, 2005.

138.    Defendants had finally admitted to what they had been concealing during the Class Period and which had contradicted their Class Period misrepresentations. Exide's stock price has never recovered to the levels it traded at during the Class Period.

139.    Immediately thereafter, Standard & Poors lowered its credit rating for Exide and in June 2005 Moody's Investor Services downgraded Exide as well.

140.    Exide's slide continued. On June 27, 2005, its independent auditor, PricewaterhouseCoopers LLC, advised Exide that its report on Exide's financial

- 61 -

statements would contain a "going-concern" qualification – an opinion by the auditor that Exide's ability to continue in business was in doubt.

141.   On July 8, 2005, Exide announced that the SEC was investigating the Company for its Class Period statements related to the Credit Agreement covenants, among other things.

142.   In October 2005, Murray Capital Management, Inc. sued Exide, Deutsche Bank Securities, Gargaro and Muhlhauser. Murray Capital had purchased $5 million of Exide's senor notes offered by the Company on March 15, 2004 and alleged that defendants had duped it just as the Class had been duped. The complaint alleged that defendants had misrepresented that Exide would comply with the EBITDA and Leverage Ratio Covenants when it fact defendants knew that Exide would violate such covenants, and that defendants had also concealed the facts that: (1) Exide could not accurately forecast its inventory requirements; (2) Exide had not written down its obsolete inventory; and (3) Exide had to record adjustments of several million dollars under a contract with one of its large North American customers.

## ADDITIONAL SCIENTER ALLEGATIONS

143.   As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such

- 62 -

statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Exide, their control over, and/or receipt and/or modification of Exide's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Exide, participated in the fraudulent scheme alleged herein.

144.    Defendants were further motivated to engage in this course of conduct in order to enable the Company to complete (i) an offering of $290 million worth of its 10-1/2% senior notes and (ii) a $60 million Floating Rate Convertible Senior Subordinated Notes offering.

## LOSS CAUSATION/ECONOMIC LOSS

145.    During the Class Period as detailed herein, defendants engaged in a scheme to deceive the market and in a course of conduct that artificially inflated Exide's stock price and operated as a fraud or deceit on Class Period purchasers of Exide's securities. Defendants did so by misrepresenting the Company's actual financial results and the state of the Company's internal controls. Defendants further misrepresented Exide's condition by falsely stating that its reorganization in bankruptcy had positioned the Company for growth and success, and that Exide was successfully restructuring and streamlining the Company, and reducing its costs. Defendants also misrepresented Exide's future prospects by repeatedly misrepresenting that, based on their forecasts, Exide would not violate the covenants

- 63 -

of the Credit Agreement and Senior Credit Facility. Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the foregoing. Later, however, when defendants' misrepresentations and fraudulent conduct were disclosed and it became apparent to the market that Exide's current results and condition were not as represented, that its future results would be much worse than defendants' prior statements had indicated, and that Exide would be in default of the Credit Agreement's and Senior Credit Facility's covenants, Exide's stock price fell precipitously as the artificial inflation created by defendants' falsehoods came out of the Company's stock price. As a result of both their purchases of inflated Exide stock during the Class Period – and the subsequent deflation in the price of those shares – plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

146. By reporting falsified financial results, the defendants presented a misleading picture of Exide's current business and future prospects. Instead of truthfully disclosing during the Class Period that its business was not as healthy as represented, defendants caused Exide to falsely report inventories and net income/loss. In addition, by misrepresenting that Exide's internal controls were effective and by further misrepresenting that the financial statements were in conformity with GAAP and fairly presented, defendants gave the false impression to the market that its financial results were accurate and reliable. Moreover, defendants' statements that Exide's bankruptcy reorganization and restructuring initiatives were positioning the

- 64 -

Company for growth and were being successfully executed gave a false impression about Exide's actual and future condition. Further, defendants' misrepresentations that Exide would comply with the Credit Agreement and Senior Credit Facility covenants gave a further false impression concerning Exide's current and future performance.

147. Defendants' misrepresentations caused and maintained the artificial inflation in Exide's stock price throughout the Class Period until the truth concerning the performance of the Company's business was revealed to the market.

148. Defendants' false and misleading statements had their intended effect, causing Exide's stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $21 per share.

149. That inflation was removed from Exide's stock in a series of two disclosures. On May 16, 2005, after the markets had closed, defendants announced that the Company expected to be in violation of the EBITDA and Leverage Ratio Covenants in the Senior Credit Facility due in part to increased costs and inventory issues. These public revelations communicated that Exide's business was not performing at the level previously described by defendants and was affecting the Company's future prospects. Investors and the market were surprised by these disclosures, and, as a result, the price of Exide stock, which had closed at $11.15 per share on May 16, 2005, fell to an opening price of $5.75 per share the following trading day, May 17, 2005, representing a one-day decline of $5.40, or 48%, and

- 65 -

closed out the day at $6.88 per share on extremely heavy volume of over 18 million shares, over 50 times the daily average volume. Moreover, late in the day on May 17, 2005, when defendants held a conference call and provided more details on the covenant violations, inventory write-offs, internal control issues, contract adjustments and increased costs, the price of Exide shares fell another $1.55, or 22%, from their closing price of $6.88 on May 17, 2005, to close at $5.33 on May 18, 2005.

150.    The share price decline in Exide's stock price as a result of defendants' May 16 and May 17, 2005 disclosures was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Exide's stock price decline negates any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic issues, industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct. In sum, as the truth about defendants' business performance was revealed to the market, the artificial inflation came out of the stock, the Company's stock price plummeted, and plaintiffs and other members of the Class were damaged, suffering economic losses of at least $6.95 per share.

151.    The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class was a direct result of (a) defendants' fraudulent scheme to artificially inflate Exide's stock price during the Class Period, and (b) the subsequent significant decline in the value of Exide's stock price when defendants' prior misrepresentations and other fraudulent conduct became known to the market.

- 66 -

## UNDISCLOSED ADVERSE INFORMATION

152.  The market for Exide common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Exide common stock traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Exide common stock relying upon the integrity of the market price of Exide common stock and market information relating to Exide, and have been damaged thereby.

153.  During the Class Period, defendants materially misled the investing public, thereby inflating the price of Exide common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.

154.  At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class.  As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Exide business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Exide and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially

- 67 -

false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

155.  At all relevant times, the market for Exide's common stock was an efficient market for the following reasons, among others:

(a)     Exide stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Exide filed periodic public reports with the SEC and the NASDAQ;

(c)     Exide regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Exide was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.

156.  As a result of the foregoing, the market for Exide common stock promptly digested current information regarding Exide from all publicly available

sources and reflected such information in Exide's stock price. Under these circumstances, all purchasers of Exide common stock during the Class Period suffered similar injury through their purchase of Exide's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

157.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and the forward-looking statement was authorized and approved by an executive officer of Exide who knew that the statement was false when made.

- 69 -

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Against All Defendants

158.  Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

159.  During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Exide's business, operations, future prospects and the intrinsic value of Exide common stock; (ii) enable the Company to complete an offering of $290 million worth of its 10-1/2% senior notes; (iii) enable the Company to complete a $60 million Floating Rate Convertible Senior Subordinated Notes offering; and (iv) cause plaintiffs and other members of the Class to purchase Exide common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

160.  Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Exide common stock in violation of §10(b) of the Exchange Act and Rule 10b-5.

- 70 -

All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

161.  Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Exide as specified herein.

162.  These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Exide's value, performance and future growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Exide and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Exide common stock during the Class Period.

163.  Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of

- 71 -

these defendants, by virtue of his responsibilities and activities as a senior officer of

the Company, was privy to and participated in the creation, development and reporting

of the Company's internal budgets, plans, projections and/or reports; (iii) each of these

defendants enjoyed significant personal contact and familiarity with the other

defendants and was advised of and had access to other members of the Company's

management team, internal reports, and other data and information about the

Company's finances, operations and sales at all relevant times; and (iv) each of these

defendants was aware of the Company's dissemination of information to the investing

public which they knew or recklessly disregarded was materially false and misleading.

164. The defendants had actual knowledge of the misrepresentations and

omissions of material facts set forth herein, or acted with reckless disregard for the

truth in that they failed to ascertain and to disclose such facts, even though such facts

were available to them.    Such defendants' material misrepresentations and/or

omissions were done knowingly or recklessly and for the purpose and effect of

concealing Exide's operating condition and future business prospects from the

investing public and supporting the artificially inflated price of its common stock. As

demonstrated by defendants' overstatements and misstatements of the Company's

business, operations and earnings throughout the Class Period, defendants, if they did

not have actual knowledge of the misrepresentations and omissions alleged, were

reckless in failing to obtain such knowledge by deliberately refraining from taking

those steps necessary to discover whether those statements were false or misleading.

165.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Exide common stock was artificially inflated during the Class Period. In ignorance of the fact that market price of Exide publicly-traded common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Exide common stock during the Class Period at artificially high prices and were damaged thereby.

166.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class and the market known the truth regarding the problems that Exide was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Exide common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

167.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

- 73 -

168. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages when defendants' disclosure of the true state of affairs caused the price of the Company's stock to drop precipitously, removing the artificial inflation from the stock's price.

## SECOND CLAIM FOR RELIEF

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

169. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

170. The Individual Defendants acted as controlling persons of Exide within the meaning of §20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, ownership and/or contractual rights, participation in and/or awareness of the Company's operations, and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited

- 74 -

access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

171.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

172.    As set forth above, Exide and the Individual Defendants each violated §10(b) and SEC Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiffs as Lead Plaintiffs and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and plaintiffs' counsel as Lead Counsel;

- 75 -

B.    Awarding compensatory damages in favor of plaintiffs and the other

Class members against all defendants, jointly and severally, for all damages sustained

as a result of defendants' wrongdoing, in an amount to be proven at trial, including

interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses

incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: May 8, 2006

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN


PETER S. PEARLMAN

Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

LITE DePALMA GREENBERG
  & RIVAS, LLC
JOSEPH J. DePALMA
SUSAN PONTORIERO
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
Telephone: 973/623-3000
973/623-0211 (fax)

Co-Liaison Counsel

- 76 -

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
ARTHUR C. LEAHY
TRIG R. SMITH
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

SCHATZ & NOBEL, P.C.
ANDREW M. SCHATZ
JEFFREY S. NOBEL
MARK P. KINDALL
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT 06103
Telephone: 860/493-6292
860/493-6290 (fax)

Co-Lead Counsel for Plaintiffs


GAINEY & MCKENNA
Thomas J. McKenna
485 Fifth Avenue
New York, NY 10017
Telephone: 212/983-1300
(212) 983-0383 (fax)

Counsel for Plaintiffs

S:\CasesSD\Exide\CPT00030290-Cons.doc

- 77 -

# Exhibit B

8-K 1 htm_5713.htm LIVE FILING

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 8-K

## CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported):                July 1, 2005

# Exide Technologies

_(Exact name of registrant as specified in its charter)_

| Delaware | 1-11263 | 23-0552730 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| 13000 Deerfield Parkway, Building 200, Alpharetta, Georgia | 30004 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:                (678) 566-9000

Not Applicable

Former name or former address, if changed since last report

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

[ ] Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
[ ] Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
[ ] Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
[ ] Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

07-280

## FILED

JUN 2 9 2007



NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**Top of the Form**

**Item 8.01 Other Events.**

Exide Technologies (the "Company") has been advised by the Enforcement Division of the Securities and Exchange
Commission ("SEC") that it has commenced a preliminary inquiry regarding the Company's prior statements that it expected
to be able to comply with its fiscal 2005 loan covenants and the going concern qualification in the audit report included in the
Company's Form 10-K filed in June 2005. The SEC noted that the inquiry should not be construed as an indication by the
SEC or its staff that any violations of law have occurred. The Company intends to fully cooperate with the inquiry.

Top of the Form

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Exide Technologies

July 7, 2005

By:   J. Timothy Gargaro
_____

Name: J. Timothy Gargaro
Title: Executive Vice President and Chief Financial Officer

# Exhibit C

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza West-One
Saddle Brook, NJ 07663
Telephone: 201/845-9600
201/845-9423 (fax)

LITE DePALMA GREENBERG
  & RIVAS, LLC
JOSEPH J. DePALMA
SUSAN D. PONTORIERO
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
Telephone: 973/623-3000
973/623-0211 (fax)

Co-Liaison Counsel

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AVIVA PARTNERS LLC, Individually and On Behalf of All Others Similarly Situated,<br><br>                  Plaintiff,<br><br>     vs.<br><br>EXIDE TECHNOLOGIES, et al.,<br><br>                  Defendants. | No. 3:05-cv-03098-MLC-JJH<br>**(Consolidated)**<br><br><u>CLASS ACTION</u><br><br>PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS EXIDE TECHNOLOGIES, CRAIG H. MUHLHAUSER, IAN J. HARVIE AND J. TIMOTHY GARGARO |

07-28
**FILED**
JUN 2 9 2007
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and subject to the definitions, instructions and relevant time period set forth below, Lead Plaintiffs Alaska Hotel & Restaurant Employees Pension Trust Fund and Lakeway Capital Management request that defendants Exide Technologies, Craig H. Muhlhauser, Ian J. Harvie and J. Timothy Gargaro respond to the following request for production of documents within the time period mandated by Rule 34, and if applicable, Rule 6, and produce the documents called for at the law firm of Cohn Lifland Pearlman Herrmann & Knopf LLP, Park 80 Plaza West-One, Saddle Brook, New Jersey 07633, or such other location to which the parties mutually agree.

## I.    DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows:

1.    "Exide" or the "Company" refers to defendant Exide Technologies and its predecessors, successors, parents, subsidiaries, divisions or affiliates (foreign or domestic), and their respective current and former officers, directors, agents, attorneys, accountants, employees, partners, or other persons occupying similar positions or performing similar functions, and all other persons acting or purporting to act on its behalf.

2.    The term "Individual Defendants" refers to Craig H. Muhlhauser, Ian J. Harvie and J. Timothy Gargaro and their agents, attorneys, accountants, employees, partners, or other persons occupying similar positions or performing similar functions, and all other persons acting or purporting to act on their behalf.

- 1 -

3.      The term "defendants" refers to Exide and the Individual Defendants.

4.      The terms "you" or "your" refer to defendants Exide, Craig H. Muhlhauser, Ian J. Harvie and J. Timothy Gargaro.

5.      The term "communicate" or "communication" refers to every manner or means of disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries or otherwise), whether orally, by document, electronically, telecopier, mail, electronic mail, personal delivery or otherwise.

6.      The term "concern" or "concerning" means referring to, describing, evidencing, reflecting, regarding, incorporating, effecting, constituting, or otherwise pertaining to or relating to, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or request. Requests for "documents concerning" a subject matter include, but shall not be limited to, documents concerning communication regarding the subject matter.

7.      "Document(s)" is intended to be interpreted in the broadest possible sense under Rule 34 of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence and includes, without limitation, all electronic data and all communications which are stored or retrievable or recorded in any manner, and also includes, without limitation, any writing or other record of information or images, including, but not limited to, print, handwriting, photographs, film, recordings, memoranda, books, records, accounts, ledgers, vouchers, invoices, drafts, bills, charge slips, letters, electronic mail or "e-mail," compact disks, CD-ROM disks, magnetic

- 2 -

tape, videotape, magnetic or optical disks, "floppy disks," "PowerPoint" or other presentation software systems, telegrams, mailgrams, correspondence, notes and minutes of meetings, conversations or telephone calls, voice mail, resolutions, interoffice memoranda, work papers, reports, projects, tabulations, studies, surveys, legal complaints and other pleadings, affidavits, interrogatories, legal briefs, legal motions, judgments, designs, drawings, schematics, maps, manuals, models, notebooks, contracts, agreements, diaries, telephone records, desk calendars, appointment books, circulars, charts, transcripts, news releases, trade releases, advertisements, press books, teletype messages, licenses, financial statements, stenographers' notebooks, punch cards, computer printouts and data, telecopier or facsimile transmissions and printouts, letters of credit, stock certificates and securities.

8.     "Employee" refers to any person who at any time acted or purported to act on your behalf or under your supervision, direction or control, including, without limitation, past and current directors, officers, principals, partners, executives, analysts, investment bankers, consultants, advisors, representatives, attorneys, accountants, agents, adjustors, lobbyists, trustees, independent contractors, assigns, business, or similar persons or entities.

9.     "Financial statements" include, without limitation, the following, whether audited or unaudited, and whether final, interim, pro forma, complete or partial: consolidated, consolidating and unconsolidated balance sheets, statements of earnings, revenues, expenses, profits and losses, additional paid-in capital, retained earnings or

- 3 -

source of application of funds, cash flow statements, notes to each of such statements, and any and all other statements and notes that relate to Exide's past or present financial condition.

10.    "Meeting" refers to the contemporaneous presence of any natural persons (including by telephone) for any purpose, whether or not such presence was by chance or prearranged, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

11.    "Murray Capital Management Action" means the lawsuit filed in the United States District Court for the Southern District of New York, captioned *Murray Capital Management, Inc. v. Exide Technologies, Deutsche Bank Securities, Inc., J. Timothy Gargaro and Craig Muhlhauser*, No. 05 Civ. 8570 (AKH).

12.    "Senior Credit Facility Lending Institutions" means the lending institutions and syndicate member banks involved in the Senior Credit Facility, including Deutsche Bank Securities, Inc. ("DBS"), Credit Suisse First Boston LLC ("CSFB"), Deutsche Bank AG (New York Branch), Fleet National Bank, Fleet Securities, Inc., Bayerische Hypo-und Vereinsbank AG, Commerzbank AG, Sumitomo Mitsui Banking Corporation and RZB Finance LLC.

13.    "Senior Credit Facility" means the May 5, 2004 Credit Agreement among Exide Technologies, Exide Global Holding Netherlands C.V., Various Lending Institutions, CSFB and Fleet Securities, Inc. and Deutsche Bank AG New York (as filed with the SEC on May 7, 2004).

- 4 -

14.    "Person(s)" refers to natural persons, proprietorships, governmental agencies, corporations, partnerships, trusts, joint ventures, groups, associations, organizations and all other entities or agencies.

15.    The term "policy" as used herein means any rule, procedure, directive, practice or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded.

16.    The term "professional services" means any work or services performed for Exide.

17.    "PwC" refers to PricewaterhouseCoopers LLP and any of its members (as defined by ET 92.06, 92.10 and 92.20 of the American Institute of Certified Public Accountants Code of Professional Conduct) and any of PwC's predecessors, successors, parents, subsidiaries, divisions, partnerships and branches; its international, foreign, national, regional and local offices; all present or former officers, directors, partners, employees, agents, attorneys, advisors, accountants, consultants, and all other persons acting or purporting to act on its behalf.

18.    "Refer," "relate," "referring" or "relating" means all documents which comprise, explicitly or implicitly refer to, were reviewed in conjunction with, or were created, generated or maintained as a result of the subject matter of the request, including, without limitation, all documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review or report on the subject matter of the request.

- 5 -

19.    The term "SEC" refers to the United States Securities and Exchange Commission, its national, regional and branch offices, and its commissioners, directors, administrators, branch chiefs, attorneys, accountants, investigators, paralegals and staff.

20.    "Telephone records" include, without limitation, telephone directories, Rolodexes, messages, telephone logs, recordings of telephone conversations and telephone bills (local and long distance).

## II.    INSTRUCTIONS

1.    In responding to these requests, you shall produce all responsive documents (including, without limitation, those stored electronically) which are in your possession, custody or control or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, officers, managing agents, agents, employees, attorneys, accountants or other representatives.  A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

2.    In responding to these requests, you shall produce all responsive documents available at the time of production and you shall supplement your responses as required by Rule 26(e) of the Federal Rules of Civil Procedure.

- 6 -

3.    Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by plaintiffs *original* documents including those stored electronically as they are kept in the usual course of business.

4.    You are to produce the original of each document described herein or, if the original is not in your custody, then a copy thereof, and all non-identical copies which differ from the original.

5.    You are requested to produce all documents described below that are in your custody or under your control in the form and in the same order within each file in which they are located prior to production.  The file folders, boxes, binders or other containers in which such documents are found are also requested to be produced intact, including the title, labels or other description of each such folder, box, binder or container.  Documents maintained electronically shall be produced in their native format with associated metadata, *i.e.*, the manner in which such documents were created, retrieved and used in the regular course of business.

6.    If production of documents is withheld on the ground of privilege, as to each such withheld document state the following information:

(a)    which privilege is claimed;

(b)    who is asserting the privilege;

(c)    a precise statement of the facts upon which said claim of privilege is based;

- 7 -

(d)    the following information describing each purportedly privileged document in sufficient detail to permit the Court to rule on the claim of privilege:

(i)    a brief description sufficient to identify the nature, type, subject matter and purpose of the document;

(ii)    the date it was prepared;

(iii)    the date it bears;

(iv)    the date it was sent;

(v)    the date it was received;

(vi)    the identity of the person preparing it;

(vii)    the identity of the person sending it;

(viii)    the identity of each person to whom it was sent or was to have been sent, including all addresses and all recipients of copies;

(ix)    a statement as to whom each identified person represented or purported to represent at all relevant times; and

(x)    all persons to whom its contents have been disclosed; and

(e)    a precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

7.    If a portion of any document responsive to these requests is withheld under claim of privilege pursuant to Instruction 6, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

- 8 -

8.     You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instructions 6 and 7 above) regardless of whether you consider the entire document to be relevant or responsive to the requests.

9.     Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

10.     If a document responsive to these requests was at any time in defendants' possession, custody or control but is no longer available for production, as to each such document state the following information:

(a)     whether the document is missing or lost;

(b)     whether the document has been destroyed;

(c)     whether the document has been transferred or delivered to another person and, if so, to whom it was transferred and at whose request;

(d)     whether the document has been otherwise disposed of;

(e)     a precise statement of the circumstances surrounding the disposition of the document and the date of its disposition;

(f)     a precise statement describing the date the document was prepared, the date the document bears, the date the document was sent and the date the document was received;

(g)     the identity of the person preparing the document, the identity of the person sending the document, the identity of the each person to whom the document was sent or was to have been sent, including all addresses and all recipients of copies of the document and the relationship of those persons named above to the client and/or author of the document;

(h)     a brief description sufficient to identify the type, nature, subject matter and purpose of the document;

(i)     all persons to whom its contents have been disclosed; and

(j)     a precise description of the place where the document was kept, including the title and/or description of the file in which said document was kept prior to the document being lost, misplaced, destroyed, transferred or otherwise disposed of and the location of such file.

11.     With respect to any category of documents, the production of which you contend is in some way "burdensome" or "oppressive," please state the specific reasons for that objection.

12.     The singular shall include the plural, and the disjunctive shall include the conjunctive, and vice versa.

- 10 -

13.    "And" shall include the term "or," and the term "or" shall include the term "and," such that each document request calls for the production of the greatest number of documents.

## III.    FORM OF PRODUCTION

All electronically stored information ("ESI") should be produced in native format linked to single page tagged image file format ("TIFF"). ESI in TIFF format should be identified by an Opticon cross-reference file. All metadata – data that describes the electronic files, *e.g.*, "date last modified" – associated with ESI shall be produced in text format linked to the associated file.

## IV.    RELEVANT TIME PERIOD

All requests herein refer to the period from January 1, 2004 through the present (the "relevant period"), unless otherwise specifically indicated, and shall include all documents and information that relate to such period, even though prepared or published outside of the relevant period.

## V.    DOCUMENTS REQUESTED

REQUEST NO. 1:

All documents produced to the SEC or any other governmental agency in response to any investigation, or formal or informal inquiries or requests for information, including any third-party documents related to such investigations.

REQUEST NO. 2:

All documents reflecting communications with the SEC or any other governmental agency relating to or concerning Exide, including, but not limited to, transcripts of testimony, exhibits to such testimony, interview notes, and Wells notices and Wells submissions.

REQUEST NO. 3:

All documents and communications concerning the preservation, search for, collection, maintenance, destruction or alternation of any and all documents (including e-mail and other electronic data) concerning Exide that were undertaken with respect to the SEC investigation or this action.

REQUEST NO. 4:

All documents relating to any internal investigation, including, but not limited to, investigations by the Audit Committee of the Board of Directors concerning the subject matter of any of the unusual items or adjustments made to Exide's financial results as described in and during Exide's May 16, 2005 press release and May 17, 2005 conference call.

REQUEST NO. 5:

All documents relating to any external investigation, including, but not limited to, investigations by attorneys or auditors retained by Exide or its Board of Directors, concerning the subject matter of any of the unusual items or adjustments made to

- 12 -

Exide's financial results as described in and during the Company's May 16, 2005 press release and May 17, 2005 conference call.

REQUEST NO. 6:

All documents relating to the subject matter of any of the unusual items or adjustments made to Exide's financial results as announced on May 16, 2005 and May 17, 2005.

REQUEST NO. 7:

All documents relating to Standard & Poor's downgrade of Exide's credit rating on or about May 18, 2005.

REQUEST NO. 8:

All documents reflecting communications between Exide and Standard & Poor's concerning the rating agency's downgrade of the Company's credit rating.

REQUEST NO. 9:

All documents relating to Moody's Investors Service's downgrade of Exide's credit rating on or about June 16, 2005.

REQUEST NO. 10:

All documents reflecting communications between Exide and Moody's Investors Service concerning the rating agency's downgrade of the Company's credit rating.

- 13 -

REQUEST NO. 11:

All documents relating to PwC's actual or contemplated inclusion of a "going concern" qualification to its audit opinion of Exide's financial statements for the period ending March 31, 2005.

REQUEST NO. 12:

All documents and communications relating to the Murray Capital Management Action.

REQUEST NO. 13:

All documents and communications relating to any potential or actual lawsuit, mediation or arbitration that arose in connection with the March 2005 offerings or purchases of senior secured or convertible senior subordinated notes.

REQUEST NO. 14:

All organizational charts, including charts of all personnel in the North American Transportation, Motive Power and Network Power Divisions, during the relevant period.

REQUEST NO. 15:

Documents sufficient to identify the floor plans and office locations of Exide employees who worked in the Company's Lawrenceville, New Jersey headquarters during the relevant period.

REQUEST NO. 16:

Documents sufficient to identify the location of all Exide manufacturing and distribution facilities (*i.e.*, both in and outside the United States).

REQUEST NO. 17:

All documents concerning Exide's accounting policies, practices, procedures and guidelines relating to the subject matter of any of the unusual items or adjustments made to Exide's financial results as described in and during the Company's May 16, 2005 press release and May 17, 2005 conference call, including, but not limited to, all documents concerning the Company's compliance with or deviation from any such policies, procedures or guidelines.

REQUEST NO. 18:

All documents relating to the application of "Fresh Start" reporting (pursuant to SOP 90-7) of Exide's assets and liabilities upon its emergence from bankruptcy reorganization in or about May 2004.

REQUEST NO. 19:

All documents concerning any audit or review of Exide's financial statements and any disagreements with the Company's independent auditor, including, but not limited to, all documents given to or received from any independent auditor retained by the Company, all documents related to any audit, review, consulting or tax engagement (including documents reflecting all payments to such auditors), and all documents concerning communications with Exide's independent auditor.

REQUEST NO. 20:

All documents related to Exide internal audits.

REQUEST NO. 21:

All documents and communications relating to or concerning any actual or considered communications between defendants and any financial analyst or media representative, including, but not limited to, conference call transcripts, scripts and documents created in preparation for conference calls, and drafts thereof.

REQUEST NO. 22:

All documents and communications relating to or concerning any analyst reports about Exide, including, but not limited to, any drafts of such reports and comments provided to analysts by any Exide employee, officer or director.

REQUEST NO. 23:

All documents and communications concerning any news article, public statement or press release mentioning Exide, including, but not limited to, all documents used, referred to, relied upon or provided for the preparation of any such article.

REQUEST NO. 24:

All documents concerning or relating to communications between Exide and its shareholders.

REQUEST NO. 25:

All documents analyzing or reviewing Exide's stock price, market capitalization or any other Exide security.

REQUEST NO. 26:

All documents and communications concerning the Company's inventory control or inventory management policies.

REQUEST NO. 27:

All documents concerning the manufacture of batteries in anticipation of or in connection with sales forecasts.

REQUEST NO. 28:

All documents relating to any review or analysis of Exide's inventories, including, but not limited to, physical counts, accruals for obsolescence, valuation and audit documentation.

REQUEST NO. 29:

Documents sufficient to identify the physical counts and valuations of Exide's inventories during the relevant period.

REQUEST NO. 30:

All documents and communications relating to or concerning meetings of Exide's Board or Directors and all committees of the Board of Directors (including the Audit Committee, Compensation Committee, Disclosure Committee, Nominating and Corporate Governance Committee, and Finance Committee, etc.), including, but

- 17 -

not limited to, board packages or presentation materials, board meeting agenda, board meeting advance materials and meeting minutes.

REQUEST NO. 31:

Copies of all diaries, datebooks, calendars, planner books, telephone logs or similar documents (whether in hard-copy or electronic form), reflecting any of the Individual Defendants' activities involving or relating to Exide or the Company's securities.

REQUEST NO. 32:

All documents and communications concerning Exide's document retention policy or policies from January 1, 2004 through the date of production.

REQUEST NO. 33:

All documents and communications concerning the retention of, or any work performed by, any document shredding company, or the destruction of documents by the Company or on behalf of Exide, from January 1, 2004 through the date of the production.

REQUEST NO. 34:

All documents and communications concerning the retention of, or any work performed by, any document shredding company on behalf of Exide from January 1, 2003 through the date of production.

REQUEST NO. 35:

All contracts with the top 25 customers and top 25 vendors for the North American Transportation, Motive Power and Network Power Divisions during the years 2003-2006, including all contracts with the U.S. government, or any of its agencies, and with Volkswagen.

REQUEST NO. 36:

All documents relating to any corporate governance reforms instituted or disciplinary action taken in connection with or as a result of the unusual items or adjustments made to Exide's financial results as described in and during the Company's May 16, 2005 press release and May 17, 2005 conference call, or as a result of the SEC investigation.

REQUEST NO. 37:

All documents concerning any complaints, concerns, warnings or reports regarding any of Exide's financial, accounting, marketing, document retention or reporting practices made to the Company's:

      (a)     Global Compliance Committee, or any member thereof;

      (b)     toll-free Feedback Line;

      (c)     Chairman of the Audit Committee; or

      (d)     Human Resource Department.

REQUEST NO. 38:

Exide's Code of Business Conduct, including, but not limited to, all versions and drafts thereof.

REQUEST NO. 39:

All documents concerning the investigation of potential violations of the law or Exide's Code of Ethics and Business Conduct with respect to complaints, concerns, warnings or reports regarding any of the Company's financial, accounting, marketing, document retention or reporting practices.

REQUEST NO. 40:

Actual, proposed or contemplated employment contracts for any Individual Defendant, including all drafts and any documents regarding the negotiation of any contract terms.

REQUEST NO. 41:

All documents and communications concerning Exide's compliance with the Sarbanes-Oxley Act of 2002, including, but not limited to, internal control procedures for financial reporting and the evaluation and reports on the effectiveness of the Company's internal controls, as well as documents upon which defendants Muhlhauser and Gargaro relied in signing Sarbanes-Oxley certifications verifying the Company's SEC filings.

REQUEST NO. 42:

All documents concerning the Company's May 17, 2005 announcement that it "made appropriate personnel changes to assure that [the Company's] controls function as intended going forward."

REQUEST NO. 43:

All documents concerning the June 29, 2005 statement contained in the Company's fiscal year 2005 Form 10-K that "[a]t March 31, 2005, we did not maintain effective controls over period-end accounts reconciliations, reviews and analyses."

REQUEST NO. 44:

Documents sufficient to identify all phone numbers (including cell phones), all computers used for Exide business purposes, all e-mail accounts, all instant message accounts, all log-in names used for any Company-related website or chat room used by the Individual Defendants, as well as all documents sufficient to identify the secretarial or administrative support personnel for the Individual Defendants.

REQUEST NO. 45:

All documents, including monthly, quarterly, annual or periodic accounting packages or analyses and supporting documentation received or created by Exide's management, officers, directors or employees on a regular or semi-regular basis regarding the Company's financial performance (reported both publicly and internally), including, but not limited to:

- 21 -

(a)    final consolidated and consolidating financial statements, including all adjusting, consolidating and eliminating entries and supporting documentation;

(b)    all analyses or reports concerning the valuation of inventories;

(c)    periodic investor reports;

(d)    periodic business and operating segment reviews;

(e)    budget/operating reports; and

(f)    all documents concerning the comparison of Exide's actual and budgeted or forecasted financial results.

REQUEST NO. 46:

All recurring accounting journals, including analyses and supporting documentation on a consolidated and subsidiary level. These should include, but are not limited to:

(a)    trial balances;

(b)    detailed general ledgers;

(c)    the general journal (*i.e.*, the listing of all journal entries);

(d)    balance sheet reserves and exposure schedules;

(e)    internal financial statements;

(f)    adjusting, consolidating and eliminating entries and supporting documentation;

(g)    recorded audit adjustments proposed by the Company's independent auditors; and

- 22 -

(h)    audit adjustments proposed by the independent auditors but not

recorded.

REQUEST NO. 47:

All documents concerning the May 5, 2004 Senior Credit Facility, including,

but not limited to, all draft versions thereof.

REQUEST NO. 48:

All documents and communications concerning any amendments to the Senior

Credit Facility after May 5, 2004.

REQUEST NO. 49:

All documents and communications concerning the negotiation of the terms of

and closing of the Senior Credit Facility.

REQUEST NO. 50:

All documents relating to any other creditors or lenders concerning the

financing Exide obtained in connection with the May 2004 Senior Credit Facility,

regardless of whether such creditors or lenders actually participated in the Senior

Credit Facility.

REQUEST NO. 51:

All documents and communications concerning or relating to due diligence

conducted by the Senior Credit Facility Lending Institutions or any other person in

connection with the Senior Credit Facility prior to May 5, 2004.

REQUEST NO. 52:

All documents and communications concerning or relating to Exide's ability, or inability, to comply with the Senior Credit Facility covenants.

REQUEST NO. 53:

All documents and communications concerning the departure of defendant Harvie from Exide in September 2005, including, but not limited to, Harvie's personnel file.

REQUEST NO. 54:

All documents and communications concerning the departure of defendant Gargaro from Exide in December 2005, including, but not limited to, Gargaro's personnel file.

REQUEST NO. 55:

All documents and communications concerning the departure of defendant Muhlhauser from Exide in March 2005, including, but not limited to, Muhlhauser's personnel file.

REQUEST NO. 56:

All documents concerning Exide's March 18, 2005 issuance of the 10-1/2% senior secured notes and floating rate convertible senior subordinated notes due in 2013, including, but not limited to, documents related to the associated indenture agreements, registration rights agreements and purchase agreements.

- 24 -

REQUEST NO. 57:

All communications with any person regarding Exide's March 18, 2005 issuance of the 10-1/2% senior secured notes and floating rate convertible senior subordinated notes due in 2013, including, but not limited to, all communications with the initial purchasers (*i.e.*, DBS, CSFB, Bank of America Securities LLC and UBS Securities LLC) and any potential or actual qualified institutional buyer.

REQUEST NO. 58:

All documents and communications concerning the monitoring and/or measurement of the effectiveness of the restructuring initiatives implemented by Exide on or about April 2004, including, but not limited to:

(a)    the closure or consolidation of manufacturing and distribution facilities;

(b)    reductions in workforce and corporate overhead;

(c)    customer service levels;

(d)    conversion of the Company's computer billing systems to a J.D. Edwards system; and

(e)    quality and productivity improvements through the Company's EXCELL lean supply chain process.

REQUEST NO. 59:

All documents and communications concerning customer complaints with respect to the billing for and the delivery of Exide's product and services.

- 25 -

REQUEST NO. 60:

All insurance agreements that could be used to satisfy any part or all of a

judgment against you or used to indemnify or reimburse you for any payments made

to satisfy a judgment in this action.

REQUEST NO. 61:

All stock transfer records for Exide common stock.

DATED: May 25, 2007            LERACH COUGHLIN STOIA GELLER
                                 RUDMAN & ROBBINS LLP
                               ARTHUR C. LEAHY
                               TRIG R. SMITH
                               GREER SPATZ

                               _____
                                      TRIG R. SMITH

                               655 West Broadway, Suite 1900
                               San Diego, CA 92101
                               Telephone: 619/231-1058
                               619/231-7423 (fax)

                               SCHATZ NOBEL IZARD, P.C.
                               ANDREW M. SCHATZ
                               JEFFREY S. NOBEL
                               MARK P. KINDALL
                               One Corporate Center
                               20 Church Street, Suite 1700
                               Hartford, CT 06103
                               Telephone: 860/493-6292
                               860/493-6290 (fax)

                               Co-Lead Counsel for Plaintiffs

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

LITE DePALMA GREENBERG
  & RIVAS, LLC
JOSEPH J. DePALMA
SUSAN D. PONTORIERO
Two Gateway Center, 12th Floor
Newark, NJ  07102-5003
Telephone:  973/623-3000
973/623-0211 (fax)

Co-Liaison Counsel

GAINEY & McKENNA
THOMAS J. McKENNA
295 Madison Avenue, Fourth Floor
New York, NY 10017
Telephone: 212/983-1300
212/983-0383 (fax)

Additional Counsel for Plaintiffs

S \CasesSD\Exide\REQ00041552 doc

- 27 -

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    That on May 25, 2007, declarant served the by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of May, 2007, at San Diego, California.

LISA A. PERMA

- 28 -

EXIDE (LEAD)
Service List - 5/25/2007   (05-0163)
Page 1 of 2

**Counsel For Defendant(s)**

Carl E. Volz
Katten, Muchin Rosenman LLP
525 W. Monroe Street, Suite 1600
Chicago, IL 60661-3693
  312/902-5200
  312/902-1061 (Fax)

Edward T. Kole
Wilentz, Goldman & Spitzer, PA
90 Woodbridge Center Drive
Woodbridge, NJ 07095
  732/636-8000
  732/855-6117 (Fax)

**Counsel For Plaintiff(s)**

Peter S. Pearlman
Cohn Lifland Pearlman Herrmann & Knopf LLP
Park 80 Plaza West-One
Saddle Brook, NJ 07663
  201/845-9600
  201/845-9423 (Fax)

Samuel H. Rudman
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
  631/367-7100
  631/367-1173 (Fax)

Darren J. Robbins
Lerach Coughlin Stoia Geller Rudman &
Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
  619/231-1058
  619/231-7423 (Fax)

Joseph J. DePalma
Susan D. Pontoriero
Lite DePalma Greenberg & Rivas, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102-5003
  973/623-3000
  973/623-0858 (Fax)

EXIDE (LEAD)
Service List - 5/25/2007     (05-0163)
Page 2 of  2

Andrew M. Schatz
Jeffrey S. Nobel
Mark P. Kindall
Schatz Nobel Izard, P.C
One Corporate Center
20 Church Street, Suite 1700
Hartford, CT  06103
    860/493-6292
    860/493-6290 (Fax)

# Exhibit D

AO88 (Rev. 12/06) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF                    COLUMBIA

AVIVA PARTNERS LLC

V.

EXIDE TECHNOLOGIES, et al.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1] 3:05-cv-03098-MLC-JJH
(Consolidated)
(District of New Jersey)

TO:  United States Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☑ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
SEE ATTACHED SCHEDULE A

| PLACE   United States Securities and Exchange Commission 100 F Street, N.E., Washington, DC 20549 | DATE AND TIME 6/22/2007 9:00 am |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *[signature]*                    Attorney for Plaintiffs | 5/25/2007 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Trig R. Smith, Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900, San Diego, CA 92101, Telephone: 619/231-1058

(See Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number

07-280

# FILED

## JUN 2 9 2007

**NANCY** MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

AO88  (Rev. 12/06) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____          _____
                          DATE                                    SIGNATURE OF SERVER

                                                      _____
                                                      ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Subdivisions (c), (d), and (e), as amended on December 1, 2006:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
    (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.
    (2) (A) A person commanded to produce and permit inspection, copying, testing, or sampling of designated electronically stored information, books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
    (B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to producing any or all of the designated materials or inspection of the premises — or to producing electronically stored information in the form or forms requested. If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.
    (3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
        (i) fails to allow reasonable time for compliance,
        (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held,
        (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies; or
        (iv) subjects a person to undue burden.
    (B) If a subpoena
        (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
        (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
        (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.
    (1) (A) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
    (B) If a subpoena does not specify the form or forms for producing electronically stored information, a person responding to a subpoena must produce the information in a form or forms in which the person ordinarily maintains it or in a form or forms that are reasonably usable.
    (C) A person responding to a subpoena need not produce the same electronically stored information in more than one form.
    (D) A person responding to a subpoena need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or to quash, the person from whom discovery is sought must show that the information sought is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
    (2) (A) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.
    (B) If information is produced in response to a subpoena that is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has and may not use or disclose the information until the claim is resolved. A receiving party may promptly present the information to the court under seal for a determination of the claim. If the receiving party disclosed the information before being notified, it must take reasonable steps to retrieve it. The person who produced the information must preserve the information until the claim is resolved.

(e) CONTEMPT. Failure of any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena issued. An adequate cause for failure to obey exists when a subpoena purports to require a nonparty to attend or produce at a place not within the limits provided by clause (ii) of subparagraph (c)(3)(A).

**SCHEDULE A**
(United States Securities and Exchange Commission)

## I.    DEFINITIONS

Unless otherwise stated, the terms set forth below are defined as follows:

1.    "You," "your" or "SEC" refers to the United States Securities and Exchange Commission and its divisions, affiliates, operating units, officers, directors, employees, representatives or agents.

2.    "Exide" or the "Company" refers to defendant Exide Technologies, any of its subsidiaries, divisions or affiliates (foreign and domestic), predecessors, successors, and any present and former officers, directors, employees, agents or members of the Board of Directors of Exide, its attorneys, accountants, advisors, and all other persons acting or purporting to act on its behalf.

3.    "Individual Defendants" refers to defendants Craig H. Muhlhauser, Ian J. Harvie and J. Timothy Gargaro and their agents, attorneys, advisors, accountants, and all other persons acting or purporting to act on their behalf.

4.    "Defendants" refers to Exide and the Individual Defendants.

5.    "PwC" refers to PricewaterhouseCoopers LLP and any of its members (as defined by ET 92.06 and 92.09 of the American Institute of Certified Public Accountants Code of Professional Conduct) and any of PwC's predecessors, successors, parents, subsidiaries, divisions, partnerships and branches; its international, foreign, national, regional and local offices; all present or former

- 1 -

officers, directors, partners, employees, agents, attorneys, advisors, accountants, consultants, and all other persons acting or purporting to act on its behalf.

6.    "Communication" or "communications" refers to every manner or means of disclosure, transfer or exchange of information (in the form of facts, ideas, inquiries or otherwise), whether orally, electronically, by document, telecopier, mail, personal delivery or otherwise.

7.    "Concerning" means relating to, referring to, describing, discussing, evidencing, regarding or constituting.

8.    "Document" or "documents" has the same meaning as "writings," which is defined in Fed. R. Civ. P. 34(a) and Fed. R. Evid. 1001. "Document" or "documents" is to be interpreted in the broadest possible sense under Fed. R. Civ. P. 34 and Fed. R. Evid. 1001 and includes, without limitation, all physically and electronically stored data.

9.    "Refer" or "relate" or "referring" or "relating" means all documents which explicitly or implicitly, in whole or in part, were received in conjunction with, or were generated as a result of, the subject matter of the request, including, but not limited to, all documents which reflect, record, memorialize, discuss, describe, compare, consider, concern, constitute, embody, evaluate, analyze, review, report on, comment on, impinge upon or impact the subject matter of the request.

- 2 -

10.   "SEC Inquiry" means the agency's inquiry into Exide as announced by the Company in its July 1, 2005 Form 8-K (filed with the SEC on July 8, 2005), including any related subsequent inquiries or enforcement actions.

11.   The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the document request all responses that otherwise might be construed to be outside of its scope.

12.   The use of the singular shall be deemed to include the plural, and the use of one gender of pronoun shall include all others, as appropriate in the context.

## II.   INSTRUCTIONS

1.   In responding to these requests, furnish all responsive documents available at the time of production, including documents in the possession of your agents and representatives.

2.   This is a continuing request for the production of documents. If, after making your initial production, you obtain or become aware of any further documents responsive to this request, you are required to produce such additional documents to plaintiffs.

3.   You are requested to produce all documents described below that are in your custody or under your control in the form and in the same order within each file in which they are located prior to production. The file folders, boxes, binders or other containers in which such documents are found are also requested to be produced

- 3 -

intact, including the title, labels or other description of each such folder, box, binder or container. Consistent with Fed. R. Civ. P. 34(b), all documents should be produced as they are kept in the usual course of business.

4.    To the extent that there are documents containing information relevant to these requests that are currently in electronic format, the documents are to be produced in their native format, as kept in the ordinary course of business.

5.    If production of documents is withheld on the ground of privilege, as to each such withheld document state the following information:

(a)    which privilege is claimed;

(b)    who is asserting the privilege;

(c)    a precise statement of the facts upon which said claim of privilege is based;

(d)    the following information describing each purportedly privileged document:

(i)    a brief description sufficient to identify its nature, *i.e.*, agreement, letter, memorandum, type, etc.;

(ii)    a brief description sufficient to identify its subject matter and purpose of the document;

(iii)    the date it was prepared;

(iv)    the date it bears;

- 4 -

(v)     the date it was sent;

(vi)    the date it was received;

(vii)   the identity of the person preparing it;

(viii)  the identity of the person sending it;

(ix)    the identity of each person to whom it was sent or was to have been sent, including all addresses and all recipients of copies;

(x)     a statement as to whom each identified person represented or purported to represent at all relevant times; and

(xi)    all persons to whom its contents have been disclosed; and

(e)     a precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

6.      If a portion of any document responsive to these requests is withheld under claim of privilege pursuant to Instruction No. 5, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

7.      You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instruction Nos. 5 and 6 above), regardless of whether you consider the entire document to be relevant or responsive to the requests.

8.  . Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full, and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

9.  If a document responsive to these requests was at any time in your possession, custody or control but is no longer available for production, as to each such document state the following information:

(a)  whether the document is missing or lost;

(b)  whether it has been destroyed;

(c)  whether the document has been transferred or delivered to another person and, if so, at whose request;

(d)  whether the document has been otherwise disposed of; and

(e)  a precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

10.  With respect to any category of documents, the production of which you contend is in some way "burdensome" or "oppressive," please state the specific reasons for that objection.

## III.  FORM OF PRODUCTION

All electronically stored information ("ESI") should be produced in native format linked to single page tagged image file format ("TIFF"). ESI in TIFF format should be identified by an Opticon cross-reference file. All metadata – data that describes the electronic file, *e.g.*, "date last modified" – associated with ESI shall be produced in text format linked to the associated file.

## IV.  RELEVANT TIME PERIOD

All requests herein refer to the time period from January 1, 2004 to the present ("relevant time period"), unless otherwise specifically indicated, and shall include all documents and information that relate to such period, even though prepared or published outside of the relevant time period.

## V.  DOCUMENT REQUESTS

REQUEST NO. 1:

All documents related to the SEC Inquiry of Exide, commenced in or about July 2005, including, but not limited to:

      (a)    investigative transcripts and exhibits;

      (b)    deposition or testimonial transcripts; and

      (c)    all documents, including indices or summaries of documents, produced or provided to the SEC by Exide, the Individual Defendants or any other person or entity (including, but not limited to, PwC).

<u>REQUEST NO. 2</u>:

All correspondence with Exide or the Individual Defendants regarding the SEC

Inquiry.

S \CasesSD\Exide\Sched A - SEC doc

- 8 -

# Exhibit E



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549

OFFICE OF THE
GENERAL COUNSEL

Stop 9612

June 22, 2007

Trig R. Smith
Lerach Coughlin Stoia Geller Rudman & Robbins, LLP
655 West Broadway, Suite 1900
San Diego, CA 92101

        Re:    Subpoena, Aviva Partners LLC v. Exide Technologies, et. al.
                Case No. 3:05-cv-03098-MLC-JJH

Dear Mr. Smith:

      This letter addresses the subpoena which you sent to the United States Securities and
Exchange Commission ("Commission") in connection with the above-listed action, pending in
the United States District Court for the District of Columbia. The subpoena seeks all
correspondence with Exide Technologies ("Exide"), its subsidiaries, divisions or affiliates,
predecessors, successors, and any present and former officers, directors, employees, agents or
members of the Board of Directors of Exide, its attorneys, accountants, advisors, and all other
persons acting or purporting to act on Exide's behalf, or with Craig H. Muhlhauser, Ian J. Harie,
or J. Timothy Gargaro, or those individuals' agents, attorneys, advisors, accountans, or any other
persons acting or purporting to act on their behalf, regarding an SEC inquiry.

      The Commission objects to the release of such information as it is subject to the law
enforcement privilege. The Commission is currently conducting law enforcement proceedings
and litigation to which the requests for investigatory records relate. Accordingly, release of
information from the investigative files could reasonably be expected to interfere with an
enforcement proceeding. Disclosure at this time could harm an investigation by revealing
evidence that staff has obtained, information which it is seeking, and the Commission's strategy
in it's investigation and potential litigation. Disclosure could also interfere with staff's use and
access. Moreover, disclosure could give persons an opportunity to mold future testimony,
explain past inconsistencies, tailor such testimony to conform to that of other witnesses who have
testified or may yet testify, suggest false evidence to witnesses who have not yet testified, harass
witnesses to intimidate them into non-cooperation with the Commission, among other harms.

07-280

**FILED**

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Page 2 of 2
June 22, 2007

The Securities and Exchange Commission further objects to this subpoena on grounds including, but not limited to, the following:

1. The Commission objects to the subpoena to the extent that it seeks production of documents or information in the possession, custody or control of persons other than the Commission.

2. The Commission objects to the subpoena to the extent that it seeks the production of documents and information subject to the attorney-client privilege, the attorney work product doctrine, and deliberative process privilege, the bank examination or financial institutions privilege, and all other applicable privileges and protections.

3. The Commission objects to the subpoena to the extent that it seeks production of documents and information subject to requests for confidential treatment or subject to the Privacy Act, 5 U.S.C. 552a.

4. The Commission objects to the subpoena to the extent that it is unduly burdensome on the Commission as a third party.

5. The Commission objects to making copies of documents requested by the subpoena in absence of an arrangement of the payment of the costs of copying and shipment.


Because the Commission objects to responding to your subpoena at this time, please withdraw the subpoena or change the response date to an indefinite date. An extended return date would enable the Commission to respond to your request for non-privileged materials at the conclusion of the investigation(s) or at such time as the staff responsible for the investigation determines that such release may be feasible. In that event you should check periodically with me to ascertain whether a response may be made. If there are any questions, please call me at 202-551-5142.

Very truly yours,

Noelle Frangipane
Senior Counsel

# Exhibit F

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------X
                         :

IN RE: SUBPOENA TO THE UNITED     :    Miscellaneous No.
STATES SECURITIES AND EXCHANGE  :
COMMISSION                    :

-----------------------------------------------------------
AVIVA PARTNERS LLC, Individually and On  :
Behalf of All Others Similarly Situated,     :
                        :
             Plaintiffs,   :    (D.N.J. Lead Docket
                        :    No. 3:05-cv-03098-MLC-JJH)
vs.                       :
                        :
EXIDE TECHNOLOGIES        :    **AFFIDAVIT OF CARL E. VOLZ IN**
13000 Deerfield Parkway       :    **SUPPORT OF MOTION TO QUASH**
Alpharetta, GA 30004,        :    **SUBPOENA DIRECTED TO THE**
                        :    **UNITED STATES SECURITIES AND**
CRAIG H. MUHLHAUSER      :    **EXCHANGE COMMISSION**
94 Library Place            :
Princeton, NJ 08540,        :
                        :
IAN J. HARVIE             :
2832 Ogden Street          :
Philadelphia PA 19130,      :
                        :
J. TIMOTHY GARGARO       :
3245 Morningview Terrace     :
Bloomfield Hills, MI 48301,    :
                        :
             Defendants.   :
------------------------------------------------------------X

I, Carl E. Volz, declare as follows:

    1.    I am a partner at the law firm of Katten Muchin Rosenman LLP ("Katten").

Among my responsibilities at Katten is the overall supervision in this action and overseeing the

coordination, collection, review and production of documents from defendant Exide

Technologies, ("Exide") in this action. I have personal knowledge of the matters stated herein

and, if called upon, I could and would competently testify thereto.

07-280

**FILED**

JUN 2 9 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

-1-

2.      Attorneys working under my direct supervision and I have searched for, reviewed and analyzed more than 250,000 documents in response to requests from the Securities and Exchange Commission ("SEC") in connection with its informal investigation of Exide Technologies. To date we have selected less than 2,000 documents for production to the SEC. This selection process was the result of intensive legal analysis and consideration by me and the attorneys with whom I work. In addition, I have prepared narrative responses to the SEC's requests for information which were also the result of legal analysis and consideration by me and the attorneys with whom I work. I believe both the selection of documents and the written responses described herein constitute and/or reflect my opinion attorney work product.

3.      I have either prepared or personally reviewed all of the materials produced to the SEC pursuant to its requests and I believe these materials include documents which reflect or constitute Exide's protectable trade secrets. These documents include information on Exide's production and pricing methodology and techniques which is known only to Exide and from which the company derives significant economic value. These documents include information on profit margins, sales data, the operation of branch locations and logistical information related thereto and the methods by which Exide batteries are manufactured, marketed, priced and delivered. If these documents were revealed to Exide's competitors it could have a severely negative impact on Exide's competitive position in the marketplace.

4.      As counsel for Defendants in the above-captioned litigation I am also familiar with the allegations of the Corrected Consolidated Class Action Complaint filed this matter. Many of the documents and much of the information provided to the SEC in connection with its ongoing informal investigation of Exide are irrelevant to the allegations set forth in the Complaint.

Further affiant sayeth naught.

## AFFIRMATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing representations are true and correct to the best of my knowledge, information and belief.

Executed on June 28, 2007

_Carl E. Volz_
Carl E. Volz

Subscribed and sworn before me this 2t[th] day of June, 2007

_Christine M. Lyman_
Notary

"OFFICIAL SEAL"
CHRISTINE M. LYMAN
Notary Public, State of Illinois
My Commission Expires March 16, 2011

-3-